UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY,<br>ALLSTATE PROPERTY AND CASUALTY INSURANCE<br>COMPANY,<br>ALLSTATE FIRE AND CASUALTY INSURANCE<br>COMPANY, and<br>ALLSTATE INDEMNITY COMPANY,<br><br>                              Plaintiffs,<br><br>vs.<br><br>153 PLAZA LLC,<br>SEUNGHO KIM,<br>JEEWHA KIM,<br>MICHELLE CHUN,<br>ORD PHYSIATRY, P.C.,<br>DOHYUNG KIM PHYSICAL THERAPY, P.C.,<br>SYNERGYCARE PHYSICAL THERAPY, P.C.,<br>JNR ACUPUNCTURE, P.C.,<br>MARC J. ROSENBLATT, D.O.,<br>JONG WON YOM, D.C., L.AC. (individually and d/b/a<br>DR.YOM'S CHIROPRACTIC AND ALTERNATIVE<br>CARE), and<br>DOHYUNG KIM, P.T.,<br><br>                              Defendants. | C.A. No. |

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Allstate Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys, Smith & Brink, P.C., allege as follows:

1

## I.   **INTRODUCTION**

1.      This case is about laypersons and healthcare providers who banded together to access and then exploit the generous benefits available to automobile accident victims under New York's "No-Fault" insurance laws.

2.      The defendants' scheme was designed to achieve several goals, including (a) allowing laypersons to participate in the ownership, operation, and control of a multi-disciplinary healthcare facility, (b) providing—and then collecting payment for—a substantial volume of healthcare tests and services, regardless of clinical necessity, and (c) channeling to the laypersons the professional fees and profits generated through the operation of the facility.

3.      As detailed herein, Defendants Seungho Kim ("S. Kim") and Jeewha Kim ("J. Kim") owned and operated 153 Plaza LLC ("153 Plaza").

4.      As members of 153 Plaza, S. Kim and J. Kim owned and operated a "multi-disciplinary" healthcare facility located at 153-01 Northern Blvd., Flushing, New York 11354 (the "Flushing Clinic"), which served as the epicenter of this scheme to defraud.

5.      As laypersons, neither S. Kim nor J. Kim was legally authorized to (a) provide professional healthcare services, (b) hold an ownership or controlling interest in any entity organized to provide professional healthcare services, or (c) share in the fees or profits generated through the delivery of professional healthcare services.

6.      To attain their unlawful goals without detection, S. Kim and J. Kim, through 153 Plaza, purposely and knowingly conspired with Defendants Marc J. Rosenblatt, D.O. ("Rosenblatt"), Jong Won Yom, D.C., L.Ac. (doing business as "Dr. Yom's Chiropractic & Alternative Care") ("Yom" and/or "Yom's Chiro"), and Dohyung Kim, P.T. ("D. Kim") (collectively, "Healthcare Provider Defendants").

7.      As the operators of the Flushing Clinic, S. Kim and J. Kim recruited the Healthcare Provider Defendants to participate in this scheme, and had the Healthcare Provider Defendants utilize a series of entities owned in their names as vehicles to submit No-Fault benefit claims to Allstate.

8.      In furtherance of this scheme, the Healthcare Provider Defendants operated through the following entities: ORD Physiatry, P.C. ("ORD"); Dohyung Kim Physical Therapy, P.C. ("Kim PT"); Synergycare Physical Therapy, P.C. ("Synergycare PT"); and JNR Acupuncture, P.C. ("JNR Acupuncture") (collectively, "Entity Defendants").

9.      To propel this scheme, S. Kim and J. Kim caused each of the Entity Defendants (and/or their owners, i.e., Rosenblatt, Yom, and D. Kim) to enter into leases which required the Entity Defendants to pay 153 Plaza for the use of space at the Flushing Clinic.

10.     The leases were purposely structured to bind the Entity Defendants to commercially unreasonable terms, and to obligate the Entity Defendants to make substantial monthly payments to 153 Plaza.

11.     These leases were also purposely structured to cause the unlawful channeling of the Entity Defendants' professional fees and profits to S. Kim and J. Kim, through 153 Plaza.

12.      In addition to the leases, S. Kim and J. Kim also installed Michelle Chun ("Chun"), a layperson, as the billing and collections agent for the Entity Defendants.

13.     Chun was caused to operate from the Flushing Clinic, and was also caused to enter into agreements with the Entity Defendants, under which Chun was authorized to handle the billing and collection of payments relating to healthcare services provided to patients of the Entity Defendants.

14. Like the lease agreements, the billing and collections agreements between Chun and the Entity Defendants were purposely structured to bind the Entity Defendants to commercially unreasonable terms, and to obligate the Entity Defendants to make substantial payments.

15. Also like the lease agreements, the billing and collections agreements between Chun and the Entity Defendants were purposely structured to cause the unlawful channeling of the Entity Defendants' professional fees and profits to S. Kim and J. Kim, through 153 Plaza.

16. These lease agreements and billing and collections agreements were essential components of this scheme, as they (a) permitted S. Kim and J. Kim to control the Healthcare Provider Defendants and the Entity Defendants, and to siphon their professional fees and profits, and (b) created the false impression that 153 Plaza and Chun maintained legitimate, arm's-length business relationships with the Healthcare Provider Defendants and the Entity Defendants.

17. In addition to these unlawful arrangements, the defendants' scheme relied upon the purported delivery of healthcare tests and services to patients treated by the Healthcare Provider Defendants and the Entity Defendants at the Flushing Clinic.

18. As detailed herein, the tests and services provided to patients of the Healthcare Provider Defendants and the Entity Defendants at the Flushing Clinic were fraudulent and not lawfully compensable under New York's No-Fault laws because: (a) the tests and services were excessive, not clinically necessary, and rendered pursuant to a pre-determined protocol designed solely to ensure financial enrichment; (b) in some instances, the tests and services were provided by independent contractors; (c) the bills submitted to Allstate by (or on behalf of) the Healthcare Provider Defendants and the Entity Defendants materially misrepresented the nature and extent of the tests and services actually provided; (d) in certain instances, the tests and services reflected

4

in the bills submitted to Allstate by (or on behalf of) the Healthcare Provider Defendants and the Entity Defendants were never actually rendered; and (e) the tests and services were furnished pursuant to a prohibited financial, compensation, or referral arrangement.

19.     Rosenblatt participated in this scheme by providing physician tests and services to patients of the Flushing Clinic, either under his own name or through ORD.

20.     In addition to providing unnecessary tests and services to patients of the Flushing Clinic, the results of which were often used to justify the provision of additional tests and services by the Healthcare Provider Defendants and the Entity Defendants, Rosenblatt's participation in this scheme was critical because (a) physicians can charge No-Fault insurers, like Allstate, the highest rates allowed for certain tests and services under the prevailing schedule of fees established by the New York Workers' Compensation Board—rates that chiropractors, physical therapists, and acupuncturists cannot charge, and (b) physicians may refer patients for treatment by physical therapists, while chiropractors may not.

21.     Yom participated in this scheme by providing chiropractic and acupuncture services to patients of the Flushing Clinic through Yom's Chiro and JNR Acupuncture.

22.     In addition to providing unnecessary tests and services to patients of the Flushing Clinic, Yom's participation in this scheme was critical because he served as the figurehead of the Flushing Clinic.  As detailed below, the defendants created a website representing that (a) the defendants' collective practices at the Flushing Clinic operated as "Murray Hill Therapeutics;" (b) Yom is "the founder of Murray Hill Therapeutics;" (c) Rosenblatt is a "local specialist" associated with Murray Hill Therapeutics; and (d) D. Kim is a "member" of Yom's "team."

23.    In this regard, the defendants took purposeful steps to represent to Allstate and the general public that Yom—and not J. Kim and S. Kim—controlled the operation of the Flushing Clinic.

24.    Yom's role in this scheme was also critical because he (a) directed the treatment of the Flushing Clinic's patients, and (b) participated in the day-to-day operation and management of the Flushing Clinic (including the other Healthcare Provider Defendants and Entity Defendants) on behalf of S. Kim and J. Kim.

25.    D. Kim participated in this scheme by providing physical therapy services to patients of the Flushing Clinic through Kim PT and Synergycare PT.

26.    D. Kim's participation in this scheme was critical because Rosenblatt was able to refer the Flushing Clinic's patients to D. Kim and his entities for further unnecessary services, and because the professional fees and profits generated by Kim PT and Synergycare PT were unlawfully channeled to S. Kim and J. Kim, through 153 Plaza.

27.    As detailed herein, the success of this scheme was dependent upon the purposeful and intentional measures taken by the defendants to evade detection, including (a) concealing the true cost of the tests and services provided to patients of the Flushing Clinic by dispersing the charges across each of the Entity Defendants, (b) causing the Healthcare Provider Defendants and/or the Entity Defendants to make leasing and billing/collection payments to Chun rather than directly to 153 Plaza, (c) concealing Chun's connection and/or association with S. Kim, J. Kim, and 153 Plaza, (d) causing Rosenblatt to enter into a sub-lease with D. Kim rather than a direct lease with 153 Plaza, and (e) installing, and then representing, Yom as the purported "founder" of the Flushing Clinic.

28.     At all relevant times, the defendants have purposely induced Allstate to make No-Fault benefit payments to the Healthcare Provider Defendants and the Entity Defendants in connection with healthcare tests and services, even though the defendants knew the charges for such tests and services were not compensable under New York law.

29.     At all relevant times, each of the above-captioned defendants knowingly and purposely conspired with one or more of their co-defendants to accomplish and/or further the unlawful objectives of the scheme described below.

30.     As detailed with particularity herein, the defendants do not have—nor have they ever had—any right to seek or collect No-Fault benefit payments from Allstate in connection with healthcare tests and services provided to patients of the Flushing Clinic because: (a) the Healthcare Provider Defendants and the Entity Defendants were unlawfully controlled by one or more layperson; (b) the tests and services provided to patients were excessive, were not clinically necessary, and were rendered pursuant to a pre-determined protocol designed solely to ensure financial enrichment; (c) in certain instances, the tests and services were provided by independent contractors; (d) the bills submitted to Allstate by (or on behalf of) the Healthcare Provider Defendants and the Entity Defendants materially misrepresented the nature and extent of the tests and services actually provided to patients of the Flushing Clinic; (e) in certain instances, the tests and services reflected in the bills submitted to Allstate by (or on behalf of) the Healthcare Provider Defendants and the Entity Defendants were never actually rendered to patients of the Flushing Clinic; and (f) the tests and services were furnished to patients of the Flushing Clinic pursuant to a prohibited financial, compensation, or referral arrangement.

31.     The success of the defendants' scheme to defraud relied on the transmission to Allstate, through the U.S. Mail, of treatment records, invoices, bills, and other insurance claim

documents warranting the Healthcare Provider Defendants' and the Entity Defendants' eligibility to collect No-Fault benefits under New York law.

32.     Allstate reasonably relied on the facial validity of the defendants' documents—and the representations contained therein—when paying No-Fault claims submitted by (or on behalf of) the Healthcare Provider Defendants and the Entity Defendants.

33.     By this Complaint, Allstate brings this action against the defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common law fraud; and (c) unjust enrichment.

34.     This action seeks actual damages in excess of $3,162,360.97 representing "No-Fault" insurance payments that were wrongfully obtained from Allstate by, or on behalf of, the Healthcare Provider Defendants and the Entity Defendants as a direct result of the defendants' unlawful conduct and material misrepresentations.

35.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to pay and/or reimburse the Healthcare Provider Defendants and the Entity Defendants (or their agents) in connection with all previously denied and/or presently pending No-Fault insurance claims that have been submitted to Allstate by, or on behalf of, the Healthcare Provider Defendants and the Entity Defendants because, at all relevant times: (a) the Healthcare Provider Defendants and the Entity Defendants were unlawfully controlled by one or more layperson; (b) the tests and services provided to patients were excessive, were not clinically necessary, and were rendered pursuant to a pre-determined protocol designed solely to ensure financial enrichment; (c) in certain instances, the tests and services were provided by independent contractors; (d) the bills submitted to Allstate by (or on behalf of) the Healthcare Provider Defendants and the Entity Defendants materially misrepresented the nature and extent of the

8

tests and services actually provided to patients of the Flushing Clinic; (e) in certain instances, the tests and services reflected in the bills submitted to Allstate by (or on behalf of) the Healthcare Provider Defendants and the Entity Defendants were never actually rendered to patients of the Flushing Clinic; and (f) the tests and services were furnished to patients of the Flushing Clinic pursuant to a prohibited financial, compensation, or referral arrangement.

36. All of the acts and omissions of the defendants described throughout this Complaint were undertaken intentionally.

37. The defendants' scheme was designed to extract payment of automobile insurance contract proceeds from Allstate to, or for the benefit of, the defendants.

38. In each patient claim at issue in this Complaint, an Allstate automobile insurance contract was the platform upon which the defendants sought—and in many cases obtained— payment for healthcare tests and services that were not compensable under New York's No-Fault laws.

39. The defendants knew that the patients identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

40. Allstate estimates that the defendants purposely submitted to Allstate hundreds of bills on behalf of the Healthcare Provider Defendants and the Entity Defendants knowing that none of the bills were lawfully compensable under prevailing New York law relative to No-Fault insurance coverage and reimbursement eligibility.

## II. THE PARTIES

### A. PLAINTIFFS

41. Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Indemnity Company are corporations

duly organized and existing under the laws of the State of Illinois, having their principal place of business in Northbrook, Illinois.

42.     At all relevant times, Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company, and Allstate Property & Casualty Insurance Company were authorized to conduct business in New York.

**B.     D<small>EFENDANTS</small>**

43.     S. Kim resides in and is a citizen of the State of New York.

44.     At all relevant times, S. Kim was never licensed to provide any professional healthcare services in the State of New York or elsewhere.

45.     J. Kim resides in and is a citizen of the State of New York.

46.     At all relevant times, J. Kim was never licensed to provide any professional healthcare services in the State of New York or elsewhere.

47.     As alleged herein, S. Kim and J. Kim participated in this scheme as members and/or managers of 153 Plaza.

48.     153 Plaza is a limited liability company organized under New York law.

49.     According to records on file with the New York Department of State, S. Kim and J. Kim are the sole members and/or managers of 153 Plaza, and 153 Plaza's principal place of business is located at 153-01 Northern Boulevard, Suite 2G, Flushing, NY 11354.

50.     153 Plaza owns the building that houses the Flushing Clinic.

51.     153 Plaza leases office space at the Flushing Clinic to the Healthcare Provider Defendants and/or the Entity Defendants.

52.     Acting through 153 Plaza, S. Kim and J. Kim owned and operated the Flushing Clinic, and also participated in the operation, management, and control of the Healthcare Provider Defendants and the Entity Defendants.

53.     Rosenblatt resides in and is a citizen of the State of New York.

54.     Rosenblatt has been licensed to practice medicine in the State of New York since 1981.

55.     As alleged herein, Rosenblatt participated in this scheme by providing tests and services to patients of the Flushing Clinic either in his individual capacity or as an owner/employee of ORD.

56.     ORD is a New York professional service corporation organized to provide professional physician services.

57.     According to records on file with the New York Office of Professions, Rosenblatt is the sole officer, director, and shareholder of ORD, and ORD's principal place of business is located at 983 Haverstraw Road, Suffern, NY 10901, which appears to be Rosenblatt's personal residence.

58.     When Rosenblatt provided tests and services to Flushing Clinic patients while acting as an owner/employee of ORD, all such patients were caused to enter into assignment of benefit agreements with ORD, which gave ORD the right to seek No-Fault payments directly from insurers.

59.     As an assignee of Allstate-insured patients, ORD sought and collected No-Fault benefit payments from Allstate.

60.      As alleged herein, because of the defendants' unlawful conduct, ORD was never lawfully eligible to receive such payments from Allstate.

61.     Yom resides in and is a citizen of the State of New York.

62.     Yom has been licensed to practice chiropractic in the State of New York since 1999, and has been licensed to practice acupuncture in the State of New York since 1999.

63.     As alleged herein, Yom participated in this scheme by providing chiropractic and acupuncture services to patients of the Flushing Clinic.

64.     Yom provided chiropractic services to Flushing Clinic patients as an individual/sole proprietor, using the assumed name "Dr. Yom's Chiropractic & Alternative Care."

65.     Yom provided acupuncture services to Flushing Clinic patients as an employee/owner of JNR Acupuncture.

66.     Dr. Yom's Chiropractic & Alternative Care is an assumed business name created by Yom for the purpose of providing professional chiropractic services to patients of the Flushing Clinic.

67.     According to an Amended Business Certificate filed in the office of the County Clerk of Queens County of the State of New York, Dr. Yom's Chiropractic & Alternative Care has a business address located at 153-01 Northern Boulevard, Suite 2G, Flushing, NY 11354.

68.     When Yom, doing business as Dr. Yom's Chiropractic & Alternative Care, provided chiropractic services to Flushing Clinic patients, all such patients were caused to enter into assignment of benefit agreements with Yom, which gave Yom the right to seek No-Fault payments directly from insurers.

69.     As an assignee of Allstate-insured patients, Yom sought and collected No-Fault benefit payments from Allstate.

70.    As alleged herein, because of the defendants' unlawful conduct, Yom was never lawfully eligible to receive such payments from Allstate.

71.    JNR Acupuncture is a New York professional service corporation organized to provide professional acupuncture services.

72.    According to records on file with the New York Office of Professions, Yom is an officer, director, and shareholder of JNR Acupuncture, and JNR Acupuncture's principal place of business is located at 153-01 Northern Boulevard, Suite 2G, Flushing, NY 11354.

73.    When Yom (or his agents) provided acupuncture services to Flushing Clinic patients through JNR Acupuncture, all such patients were caused to enter into assignment of benefit agreements with JNR Acupuncture, which gave JNR Acupuncture the right to seek No-Fault payments directly from insurers.

74.    As an assignee of Allstate-insured patients, JNR Acupuncture sought and collected No-Fault benefit payments from Allstate.

75.    As alleged herein, because of the defendants' unlawful conduct, JNR Acupuncture was never lawfully eligible to receive such payments from Allstate.

76.    D. Kim resides in and is a citizen of the State of New York.

77.    D. Kim has been licensed to practice physical therapy in the State of New York since 1999.

78.    As alleged herein, D. Kim participated in this scheme by providing healthcare services to patients of the Flushing Clinic.

79.    D. Kim provided these healthcare services as an owner/employee of Kim PT and Synergycare PT.

80.     Kim PT is a New York professional service corporation organized to provide professional physical therapy services.

81.     According to records on file with the New York Office of Professions, D. Kim is the sole officer, director, and shareholder of Kim PT, and Kim PT's principal place of business is located at 153-01 Northern Boulevard, Suite 2G, Flushing, NY 11354.

82.     When D. Kim (or his agents) provided healthcare services to Flushing Clinic patients through Kim PT, all such patients were caused to enter into assignment of benefit agreements with Kim PT, which gave Kim PT the right to seek No-Fault payments directly from insurers.

83.     As an assignee of Allstate-insured patients, Kim PT sought and collected No-Fault benefit payments from Allstate.

84.      As alleged herein, because of the defendants' unlawful conduct, Kim PT was never lawfully eligible to receive such payments from Allstate.

85.     Synergycare PT is a New York professional service corporation organized to provide professional physical therapy services.

86.     According to records on file with the New York Office of Professions, D. Kim is the sole officer, director, and shareholder of Synergycare PT, and Synergycare PT's principal place of business is located at 153-01 Northern Boulevard, Suite 2F, Flushing, NY 11354.

87.     When D. Kim (or his agents) provided healthcare services to Flushing Clinic patients through Synergycare PT, all such patients were caused to enter into assignment of benefit agreements with Synergycare PT, which gave Synergycare PT the right to seek No-Fault payments directly from insurers.

88.     As an assignee of Allstate-insured patients, Synergycare PT sought and collected No-Fault benefit payments from Allstate.

89.     As alleged herein, because of the defendants' unlawful conduct, Synergycare PT was never lawfully eligible to receive such payments from Allstate.

90.     Chun resides in and is a citizen of the State of New York.

91.     At all relevant times, Chun was never licensed to provide any professional healthcare services in the State of New York or elsewhere.

92.     As alleged herein, Chun conspired with the defendants to participate in the operation, management, and/or control of the Healthcare Provider Defendants and the Entity Defendants.

## III.    JURISDICTION AND VENUE

93.     Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

94.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

95.     Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (c) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

96.     At all relevant times, the defendants have engaged in purposeful activities in New York by seeking and submitting payment demands for claims made under New York's No-Fault laws, as detailed, *infra*.

97.     The defendants' activities in and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

98.     As the allegations and causes of action in the within Complaint arise from the defendants' fraudulent demands for payment under the No-Fault laws of New York, there is no question that there exists a substantial relationship between the transactions at issue, and Allstate's causes of action.

## IV.     APPLICABLE NO-FAULT LAWS AND LICENSING STATUTES

### A.     NEW YORK'S NO-FAULT LAWS

99.     Allstate underwrites automobile insurance in the State of New York.

100.    New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services.

101.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq.*), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq.*) (collectively, "the No-Fault laws"), automobile insurers are required to provide Personal Injury Protection Benefits (hereinafter, "No-Fault benefits") to Allstate claimants.

102.    Under the New York No-Fault law, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

103.    "Basic economic loss" is defined to include "all necessary expenses" for healthcare services.  N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

104.    No-Fault benefits include up to $50,000.00 per Allstate claimant for reasonable expenses that are incurred for necessary healthcare goods and services.

105.    A patient can assign his/her No-Fault benefits to healthcare service providers.

106.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary healthcare services rendered, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3").

107.     Alternatively, healthcare providers may submit claims to insurance carriers using the Health Care Financing Administration claim form (known as the "HCFA-1500" form).

108.     NF-3 and HCFA-1500 forms are important documents in the insurance industry. They certify that the provider's request for payment is not materially false, misleading, or fraudulent.  11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

109.     Indeed, pursuant to N.Y. Ins. Law § 403(d), NF-3 and HCFA-1500 forms must be verified by the healthcare provider subject to the following warning:   "Any person who knowingly and with intent to defraud any insurance company or other persons files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime."

110.     It is a material misrepresentation to submit NF-3 and HCFA-1500 forms for treatment, testing, and other services that: (a) are never provided; (b) are billed as expensive/complex procedures when, in reality, a less complex and less expensive service was actually provided; or (c) are billed at a greater monetary charge than is permitted by the applicable fee schedule.

**B.**     <u>Unlawful Control of Professional Service Entities</u>

111.    New York law requires that all professional healthcare service corporations be owned and controlled by appropriately licensed healthcare professionals. *See* N.Y. Bus. Corp. Law §§ 1503, 1507.

112.    Similarly, New York law prohibits anyone from engaging in the practice of medicine except for those licensed to practice medicine. *See* N.Y. Educ. Law §§ 6521-6522.

113.    Thus, in New York, only a licensed physician may: (a) practice medicine; (b) own and control a professional service corporation authorized to practice medicine; (c) employ and supervise other physicians; and (d) derive—absent statutory exceptions not applicable in this case—economic benefit from physician services.

114.    Likewise, under New York law, only licensed physical therapists may: (a) practice physical therapy; (b) own and control a professional service corporation authorized to practice physical therapy; (c) employ and supervise other physical therapists; and (d) derive— absent statutory exceptions not applicable in this case—economic benefit from physical therapy services.

115.    Moreover, for a provider of healthcare services to be eligible to bill for and collect charges from an insurer for healthcare services pursuant to N.Y. Ins. Law § 5102(a), it must be the actual provider of the service. Under the No-Fault Laws, professional service entities are not eligible to bill for services, or collect for those services from an insurer, where the services were actually rendered by persons who are not employees of the professional service entity, such as independent contractors.

116.    New York's No-Fault Laws provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails

to meet any applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

117.    New York Business Corporation Law § 1504 provides that no professional service corporation may render professional services except through individuals authorized by law to render such professional services.

118.    New York Business Corporation Law § 1507 prohibits a professional service corporation from issuing shares to individuals unless they are "engaged in the practice of such profession in such a corporation."  It also prohibits such shareholder(s) from entering into any agreement, granting proxies, or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice.

119.    Pursuant to New York Business Corporation Law § 1508, no individual may be an officer or director of a professional service corporation unless he is authorized by law to practice in this state a profession that such corporation is authorized to practice.

120.    New York Education Law § 6522 prohibits anyone from engaging in the practice of medicine except for those licensed to practice medicine. *See* N.Y. Educ. Law § 6522.

121.    Pursuant to New York Education Law § 6530(11), licensed physicians are prohibited from "permitting, aiding or abetting an unlicensed person to perform activities requiring a [medical] license."

122.    Licensed physicians are also prohibited from delegating professional responsibilities to persons who lack qualification, training, experience, and/or licensure to perform them.

123.    Further, under New York Education Law § 6530(19), it is professional misconduct for a licensed physician to permit any person to share in the fees for professional

services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

124.    The sharing or splitting of fees derived from the provision of professional physician services constitutes professional misconduct and subjects a physician to serious penalties, including sanctions against the offending physician's medical license.

125.    Similarly, under Rule 29.1(b)(4) of the Board of Regents, physical therapists are prohibited from permitting any person to share in the fees for professional services, other than: a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice the same profession, or a legally authorized trainee practicing under the supervision of a licensed practitioner. 11 N.Y.C.R.R. § 29.1(b)(3).

126.    Additionally, pursuant to New York Education Law § 6509-a, it is professional misconduct for physical therapists to engage in the division or sharing of professional fees with a person not licensed or otherwise authorized to practice physical therapy.

127.    New York Education Law § 6530(18) prohibits a licensed physician from "[d]irectly or indirectly offering, giving, soliciting, or receiving, or agreeing to receive, any fee or other consideration to or from a, third party for the referral of a patient or in connection with the performance of professional services."

128.    Likewise, under Rule 29.1(b)(3) of the Board of Regents, applicable to "the practice of any profession licensed, certified or registered pursuant to title VIII of the Education Law"—which includes physical therapy, chiropractic, and acupuncture—practitioners are prohibited from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or

client or in connection with the performance of professional services." 11 N.Y.C.R.R. § 29.1(b)(3).

129.     Accordingly, New York law prohibits any licensed physician, physical therapist, chiropractor, or acupuncturist from giving and/or receiving payment to and/or from another licensee or third party in exchange for the referral of a patient.

130.     Under New York Education Law § 6530, it is also professional misconduct for a licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatments not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

131.     In *State Farm v. Mallela*, 4 N.Y.3d 313 (N.Y. 2005), the New York Court of Appeals upheld 11 N.Y.C.R.R. § 65-3.16(a)(12) by holding that corporations organized and registered to provide professional healthcare services that are fraudulently incorporated under New York Business Corporations Law §§ 1507 and 1508 and New York Education Law § 6507(4)(c) (i.e., those corporations that are operated and/or controlled by individuals or entities not licensed or authorized to provide the professional healthcare services that the corporations are organized and registered to provide) are not entitled to No-Fault reimbursement.

132.     In the matter *Metroscan Imaging, P.C. v. GEICO Ins. Co.*, 823 N.Y.S.2d 818, 821-822 (N.Y. App. Term, 2d Dep't 2006), the court held that an insurer may maintain a cause of action against a fraudulently incorporated medical provider to recover monies paid on or after April 5, 2002 (the effective date of 11 N.Y.C.R.R. § 65-3.16(a)(12)).

133.     As detailed below, the defendants violated one or more of these New York statutes and regulations through the operation and management of the Entity Defendants.

### C.  NEW YORK WORKERS' COMPENSATION FEE SCHEDULE

134.    The New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule").

135.    Both healthcare providers and automobile insurers consult the Fee Schedule to determine the level of reimbursement payable on legitimate claims.

136.    The purpose of the fee schedule is to: (a) provide comprehensive billing guides in order to allow healthcare providers to appropriately describe their services and minimize disputes over reimbursement through the establishment of maximum permissible fees that can be charged for services included in the Fee Schedule; and (b) set limits on charges that can be advanced by healthcare service providers to protect claimants from having their medical benefit limits artificially eroded by excessive fees.

137.    Section 5102(a)(1) of the No-Fault Law defines "basic economic loss" as including "[a]ll necessary expenses incurred for…professional health services," "subject to the limitations of" Insurance Law § 5108.

138.    Insurance Law § 5108(b) provides that the Superintendent of Insurance "shall promulgate rules and regulations implementing and coordinating" the provisions of the New York No-Fault Law and the Workers' Compensation Law "with respect to charges for the professional health services" specified in Insurance Law § 5102(a)(2), "including the establishment of schedules for all such services for which schedules have not been prepared and established by the chairman of the workers' compensation board."

139.    Insurance Law § 5108(a) also provides that the "charges for services specified in" Insurance Law § 5102(a)(1) "shall not exceed the charges permissible under the schedule prepared and established by the chairman of the workers' compensation board."

**D.** **GUIDELINES FOR CHIROPRACTORS IN A MULTIDISCIPLINARY PRACTICE**

140.    In 2012, the New York Office of Professions published a "Practice Alert" entitled "Multidisciplinary Practices," which provides guidance to chiropractors working in a multidisciplinary setting alongside a physician. *See* Exhibit 1.

141.    According to the Office of Professions, chiropractors should not employ individuals licensed to practice medicine, nor should they serve as the "controlling entity in a practice with licensees in medicine or any other profession authorized to perform procedures beyond the scope of [the] chiropractic license, which includes physical therapy" and other healthcare disciplines.

142.    Chiropractors are also advised against "making direct referrals to physical therapists since [physical therapists] are authorized to practice only on referrals from physicians, dentists, podiatrists or nurse practitioners." Instead, chiropractors are encouraged to help their patients locate a physician who can lawfully make the referral.

143.    Further, chiropractors are prohibited from working for physicians as consultants—as such an arrangement is deemed fee splitting.

144.    The Office of Professions also advises chiropractors that they can neither "direct patient care" nor assume "complete control" over patients in a medical practice, as doing so would go beyond the scope of the practice of chiropractic.

145.    As explained below, the defendants purposely structured the operation of the Flushing Clinic to circumvent this guidance, and to permit the unlawful management and control of the Healthcare Provider Defendants and Entity Defendants.

## V.        FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

146.    New York's No-Fault system is designed to provide patients and healthcare providers with compensation for the provision of healthcare services, and is also designed to require prompt payment of patient claims.

147.    However, New York's No-Fault laws and enacting regulations are clear that providers are not eligible to seek or receive No-Fault reimbursement under Insurance Law § 5102 if they fail to meet *any* New York State or local licensing requirement necessary to perform such services in New York.

148.    As alleged herein, the defendants have taken advantage of New York's No-Fault system by causing the Healthcare Provider Defendants and the Entity Defendants to demand and collect No-Fault benefit payments from Allstate in connection with: (a) tests and services that were excessive, not clinically necessary, and rendered pursuant to a pre-determined protocol designed solely to ensure financial enrichment; (b) tests and services that were in some instances provided by independent contractors; (c) tests and services that were not provided in the manner represented in the bills submitted to Allstate; (d) tests and services that, in certain instances, were never actually rendered; and (e) tests and services that were furnished pursuant to a prohibited financial, compensation, or referral arrangement.

149.    When seeking No-Fault benefit payments on behalf of Flushing Clinic patients, the defendants knowingly and purposely caused the Healthcare Provider Defendants and the Entity Defendants to submit documentation to Allstate reflecting tests and services that were excessive and not clinically necessary.

150.    To conceal the excessive and unnecessary nature of the tests and services provided to Flushing Clinic patients, the Healthcare Provider Defendants and the Entity

Defendants misrepresented and/or exaggerated the conditions and diagnoses of the Flushing Clinic's patients.

151.    When seeking No-Fault benefit payments on behalf of Flushing Clinic patients, the defendants also knowingly and purposely caused the Healthcare Provider Defendants and the Entity Defendants to submit documentation to Allstate that misrepresented the nature of the services actually provided.

152.    To conceal the true nature of the healthcare services actually provided and to inflate their claims for payment with respect to Flushing Clinic patients, the Healthcare Provider Defendants and the Entity Defendants submitted documentation and invoices to Allstate that mispresented the nature and extent of certain examinations, diagnostic tests, and healthcare services.

153.    Additionally, when seeking No-Fault benefit payments on behalf of Flushing Clinic patients, the defendants knowingly and purposely caused one or more of the Healthcare Provider Defendants and the Entity Defendants to submit claims to Allstate seeking No-Fault benefit payments even though the provider was not lawfully eligible for payment.

154.    For example, in several instances, the Healthcare Provider Defendants and/or the Entity Defendants submitted No-Fault benefit claims to Allstate on behalf of Flushing Clinic patients when the billed-for services were provided by an independent contractor, or when the registered owner of the provider entity failed to practice through the company.

155.    In all such cases, the No-Fault benefit claims were not compensable under New York law, and the defendants purposely and knowingly concealed the non-compensable nature of the claims by materially misrepresenting the identity of the person(s) who actually delivered the billed-for services to the Flushing Clinic patients.

156. Finally, the defendants further exploited New York's No-Fault system by causing the Healthcare Provider Defendants and the Entity Defendants to seek and collect No-Fault benefit payments from Allstate knowing that (a) the Healthcare Provider Defendants and the Entity Defendants were operated, managed, and controlled by one or more non-licensed layperson, and (b) the Healthcare Provider Defendants and the Entity Defendants were caused to split their professional fees and profits with one or more non-licensed layperson.

157. As alleged herein, acting through 153 Plaza, S. Kim's and J. Kim's control over (a) the operation and management of the Flushing Clinic, and (b) the operation and management of the Healthcare Provider Defendants and the Entity Defendants compromised patient care, as the provision of healthcare services to patients of the Flushing Clinic by the Healthcare Provider Defendants and the Entity Defendants was subject to the pecuniary interests of one or more non-licensed layperson.

158. Because the Healthcare Provider Defendants and the Entity Defendants (a) were operated, managed, and controlled by one or more non-licensed layperson, and (b) were caused to split their professional fees and profits with one or more non-licensed layperson (i.e., S. Kim and J. Kim, through 153 Plaza), the Healthcare Provider Defendants and the Entity Defendants were operated in violation of New York law, thus rendering each of the Healthcare Provider Defendants and the Entity Defendants completely ineligible for No-Fault reimbursement under Insurance Law § 5102(a)(1).

159. By demanding No-Fault benefit payments from Allstate on behalf of the Flushing Clinic's patients, the defendants, at all relevant times, knowingly and purposely caused the Healthcare Provider Defendants and the Entity Defendants to seek and collect No-Fault benefit

payments from Allstate even though the Healthcare Provider Defendants and the Entity Defendants were not lawfully eligible to seek or collect such payments.

A.      **UNLAWFUL LAYPERSON CONTROL OF THE FLUSHING CLINIC AND ASSOCIATED HEALTHCARE PROVIDERS**

160.      In furtherance of this scheme, the defendants operated the Flushing Clinic, which served as a multidisciplinary clinic offering healthcare services from a wide array of providers, including a physician (i.e., Rosenblatt), a chiropractor/acupuncturist (i.e., Yom), and a physical therapist (i.e., D. Kim).

161.      S. Kim and J. Kim established the Flushing Clinic so that they could manage, control, and profit from the delivery of healthcare services to patients of the Flushing Clinic.

162.      As detailed herein, S. Kim and J. Kim took several steps to conceal their involvement in the operation, management, and control of the Flushing Clinic.

163.      First, acting through 153 Plaza, S. Kim and J. Kim purchased a vacant lot located at 153-01 Northern Blvd., Flushing, NY, and then constructed the building which currently houses the Flushing Clinic.

164.      Second, after establishing a location for the scheme, S. Kim and J. Kim recruited Rosenblatt, Yom, and D. Kim to participate in the scheme.

165.      Third, once recruited into the scheme, the Healthcare Provider Defendants and the Entity Defendants were caused to enter into leases for the use of space at the Flushing Clinic, the terms of which required the Healthcare Provider Defendants and the Entity Defendants to make excessive monthly rent payments to 153 Plaza.

166.    These lease agreements were purposely structured as a means to channel the Healthcare Provider Defendants' and the Entity Defendants' professional fees and profits to S. Kim and J. Kim through 153 Plaza.

167.    These lease agreements were also meant to create the outward but false illusion that S. Kim and J. Kim, through 153 Plaza, maintained legitimate, arm's-length business relationships with the Healthcare Provider Defendants and the Entity Defendants, even though they did not.

168.    In certain instances, the defendants took steps to conceal the financial connections between the Flushing Clinic's healthcare providers and 153 Plaza.

169.    For example, although ORD and/or Rosenblatt were permitted access to the Flushing Clinic through a sublease with D. Kim, Rosenblatt was instructed to send lease payments directly to 153 Plaza rather than to D. Kim.

170.    Additionally, one or more of these lease agreements is a sham, and was drafted solely as a means to falsely support the payments made in connection with the provider's use of the Flushing Clinic.

171.    For example, at least one of the Flushing Clinic lease agreements between 153 Plaza and the Healthcare Provider Defendants' and/or the Entity Defendants' has a beginning date of April 1, 2006.

172.    However, 153 Plaza did not exist on April 1, 2006 as it was not organized until May 15, 2007.

173.    The subject lease is also bogus because the Flushing Clinic was not constructed until 2009, approximately three (3) years after the lease agreement purportedly commenced.

174.     As a further step in the scheme, S. Kim and J. Kim induced Chun to participate in the scheme to serve as the billing and collections agent for the Healthcare Provider Defendants and the Entity Defendants.

175.     Once Chun was recruited to the scheme, the Healthcare Provider Defendants and the Entity Defendants were caused to enter into billing and collections agreements with Chun, the terms of which required the Healthcare Provider Defendants and the Entity Defendants to pay excessive monthly fees for these purported billing and/or collections services.

176.     Upon information and belief, in exchange for her agreement to participate in the scheme, Chun was permitted to retain a portion of the professional healthcare fees and profits collected on behalf of the Healthcare Provider Defendants and the Entity Defendants under the billing and collections agreements.

177.     As a means to conceal the defendants' unlawful conduct, the billing and collections agreements entered into by the Healthcare Provider Defendants and the Entity Defendants were structured as "employment agreements," under which Chun purportedly was hired as an employee of the Healthcare Provider Defendants and/or the Entity Defendants.

178.     Although the terms of these agreements obligated the Healthcare Provider Defendants and the Entity Defendants to pay Chun a flat fee of $2,000.00 per month, with respect to one or more of the Healthcare Provider Defendants and/or the Entity Defendants, Chun's compensation was actually determined based on the provider's collections in violation of New York law.

179.     Upon information and belief, S. Kim and J. Kim, through 153 Plaza, received monies paid to Chun by the Healthcare Provider Defendants and/or the Entity Defendants.

180.     The billing and collections agreements entered into by the Healthcare Provider Defendants and/or the Entity Defendants were purposely structured as a means to channel the providers' professional fees and profits to S. Kim and J. Kim through Chun and/or 153 Plaza.

181.     The billing and collections agreements entered into by the Healthcare Provider Defendants and/or the Entity Defendants further permitted S. Kim and J. Kim, through 153 Plaza, to participate in the operation, management, and control of the Healthcare Provider Defendants and the Entity Defendants.

182.     The billing and collections agreements entered into by the Healthcare Provider Defendants and/or the Entity Defendants were also meant to create the illusion that Chun and 153 Plaza maintained legitimate, arm's-length business relationships with the Healthcare Provider Defendants and the Entity Defendants, even though they did not.

183.     Like the lease agreements, the billing and collection agreements are also bogus because the agreements are not administered according to their terms.

184.     For example, although the agreements obligate the Healthcare Provider Defendants and the Entity Defendants to pay Chun a flat fee of $2,000.00 per month, the monthly payments made to Chun vary.

185.     The variation in the amounts actually paid to Chun by the Healthcare Provider Defendants and the Entity Defendants according to these billing and collections agreements suggest that Chun—and, in turn, S. Kim and J. Kim, through 153 Plaza—are compensated based upon a percentage of each provider's monthly collections.

186.     In addition to the sham lease and billing/collections agreements, the actual set-up of the Flushing Clinic was designed to allow one or more non-licensed layperson to control the clinic and its associated healthcare providers.

187.     Acting through 153 Plaza, S. Kim and J. Kim established the Flushing Clinic as a turn-key clinic, meaning that the Healthcare Provider Defendants and the Entity Defendants were not burdened with the costs or administrative duties typically associated with opening a legitimate healthcare practice (i.e., finding a location, negotiating rent, hiring personnel, etc.) when they began to operate from the Flushing Clinic.

188.     Rather, all such duties and responsibilities were assumed by S. Kim and J. Kim, acting through 153 Plaza, including the hiring of administrative and/or non-professional staff which was used to carry-out the day-to-day operations of the Flushing Clinic.

189.     To further conceal their unlawful conduct, S. Kim and J. Kim, upon information and belief, installed Yom as the figurehead of the Flushing Clinic.

190.     According to a website created by (or on behalf of) the defendants, the Flushing Clinic is referred to as "Murray Hill Therapeutics," and Yom is identified as the clinic's "founder."

191.     The defendants' website also identifies D. Kim as a member of Yom's staff and/or "team" on a page entitled "Our Staffs: Meet the Team."

192.     Further, on a page entitled "Our Staffs: Meet the Doctor," Yom is identified as the "Founder" of "Murray Hill Therapeutics" and Rosenblatt is identified as a "Local Specialist."

193.     Despite the representations made on their website, the defendants took purposeful steps to create the appearance that the Healthcare Provider Defendants and the Entity Defendants operated independently of each other.

194.     For example, although the Entity Defendants each operated from 153-01 Northern Blvd., Flushing, NY 11354, the Entity Defendants were caused to utilize two different suite numbers when registering with the New York Secretary of State and New York Office of

Professions for the purpose of creating the appearance that the Entity Defendants were not associated with each other.

195.    Despite these efforts, however, the Healthcare Provider Defendants and the Entity Defendants were neither separate nor unrelated providers.

196.    For example, the defendants' website contains several statements designed to make the reader believe that "Murray Hill Therapeutics" (a/k/a the Flushing Clinic) is actually a single entity which provides several different types of healthcare services:

a.   "We provide a combination of healthcare treatment providers - chiropractic, acupuncture, physical therapy and clinical massage therapy, which allows us to create customized treatment plans tailored to the individual needs of each patient." ("About Us" page)

b.   "We provide a combination of healthcare treatment providers - chiropractic, acupuncture and physical therapy, which allows us to create customized treatment plans tailored to the individual needs of each patient." (Homepage)

c.   "At Murray Hill Therapeutics, we have created a tranquil urban wellness sanctuary where we offer not only acupuncture and chiropractic treatment, but also physical therapy, massage therapy and more." ("Our Services: Acupuncture" page)

197.    Additionally, on the "About Us: Information" page, individuals seeking to email the doctor at Murray Hill Therapeutics are directed to email yomchiro1@yomchiro.com, and individuals looking to reach Murray Hill Therapeutics' general email account are directed to contact info@yomchiro.com.

198.    Nothing on the defendants' website indicates that "Murray Hill Therapeutics" is actually comprised of several different businesses, each of which is separately owned by a member of the staff/team.

199.    Thus, it is represented to the public that: (a) D. Kim is Yom's employee; (b) the defendants actually operate as one practice rather than separate healthcare entities; (c) Yom holds a position of authority at the Flushing Clinic and/or "Murray Hill Therapeutics"; and (d) Yom has a professional relationship with Rosenblatt that goes above and beyond merely sharing a clinic.

200.    Additionally, the Healthcare Provider Defendants and the Entity Defendants have submitted virtually identical billing documentation to Allstate, and also share (a) an office phone number, a billing phone number, and a fax number; (b) administrative and/or non-professional front desk staff; and (c) common areas.

201.    The Healthcare Provider Defendants and the Entity Defendants are also linked together by Chun, who (a) purports to provide billing/collection services to the Healthcare Provider Defendants and the Entity Defendants, and (b) maintains a regular physical presence at the Flushing Clinic.

202.    Together with Yom, Chun was installed to oversee the day-to-day operation and management of the Flushing Clinic.

203.    For example, during a site inspection of the Flushing Clinic, Chun met the investigator at the front desk, and was present during the initial portion of the inspection.

204.    Additionally, during the same inspection of the Flushing Clinic, Chun introduced Yom to the inspector.  Yom then joined in the inspection, and represented himself as the "owner" of the Flushing Clinic.

205.    If the billing and collections agreements were legitimate and if Chun was actually employed as the billing and collections agent for the Healthcare Provider Defendants and the Entity Defendants, then there is no reason why Chun should have led the initial portion of the site inspection at the Flushing Clinic.

206.    Overall, Chun's and Yom's involvement in the day-to-day management of the Flushing Clinic facilitated J. Kim's and S. Kim's control over both the Flushing Clinic and its associated healthcare providers.

207.    Indeed, J. Kim and S. Kim, through 153 Plaza, received the professional fees and profits generated by the Healthcare Provider Defendants and the Entity Defendants.

208.    The unlawful channeling of the Healthcare Provider Defendants' and the Entity Defendants' professional fees and profits was accomplished through Chun's billing and collections agreements, and through the lease agreements with 153 Plaza.

209.    In the case of one or more of the Healthcare Provider Defendants and the Entity Defendants, Chun was granted access to the provider's corporate operating account, and was permitted to draft payments to herself and to 153 Plaza from the provider's account.

210.    J. Kim and S. Kim, acting through 153 Plaza, utilized other means to control the Flushing Clinic and to receive professional fees and profits from the Healthcare Provider Defendants and the Entity Defendants.

211.    Upon information and belief, one or more of the Healthcare Provider Defendants and the Entity Defendants were caused to assign healthcare receivables to 153 Plaza.

212.    As a general limited liability company, there is no legitimate or lawful reason why 153 Plaza would hold any rights to unpaid healthcare insurance receivables or healthcare insurance proceeds.

213.     However, as security for the loan obtained by 153 Plaza for the purpose of constructing and owning the Flushing Clinic, 153 Plaza pledged all of its rights to healthcare insurance receivables and healthcare insurance proceeds as collateral for the loan.

214.     As a real estate company, 153 Plaza is not lawfully authorized to provide professional healthcare services, nor is it lawfully eligible to receive healthcare insurance payments, including No-Fault benefit payments.

215.     Overall, one or more unlicensed layperson unlawfully owned, operated, and/or controlled the Flushing Clinic and its associated healthcare providers, including the Healthcare Provider Defendants and the Entity Defendants.

216.      The Healthcare Provider Defendants and the Entity Defendants were also caused to unlawfully channel their professional fees and profits to one or more unlicensed layperson.

217.     As a result of this unlawful conduct, the Healthcare Provider Defendants and the Entity Defendants were never eligible to receive No-Fault reimbursement under New York law.

**B.     FRAUDULENT TREATMENT PROTOCOL**

218.     The Flushing Clinic was designed to allow the defendants to provide the maximum possible amount of healthcare services without regard to the individual needs of the clinic's patients.

219.     As part of this scheme, Yom was installed as the public face of the Flushing Clinic, and, in this role, Yom, upon information and belief, participated in the creation and control of the clinic's treatment protocols.

220.     The defendants' treatment protocol was designed to ensure that the Healthcare Provider Defendants and the Entity Defendants submitted false, excessive, and/or inflated

charges for examinations, consultations, diagnostic testing, interventional pain procedures, chiropractic services, and physical therapy services.

221. Nearly all of the Flushing Clinic's patients are treated in the same manner.

222. Virtually every Flushing Clinic patient receives treatment from Yom, acting through Yom's Chiro and/or JNR Acupuncture, at the outset of their care.

223. Following their initial visits with Yom, the Flushing Clinic's patients are referred to Rosenblatt for additional physician services.

224. Notably, Yom is the referral source for nearly every Flushing Clinic patient treated by Rosenblatt.

225. Additionally, nearly all of Yom's initial examination reports contain a recommendation that the patient receive a physiatry consultation (to be performed by Rosenblatt).

226. Once evaluated by Rosenblatt, the Flushing Clinic patients are then directed to continue their care with the other providers operating from the Flushing Clinic.

227. Overall, it is clear that patients of the Flushing Clinic are funneled to the Healthcare Provider Defendants and the Entity Defendants for the purpose of generating justifications for (a) continued—and wholly unnecessary—healthcare services, including chiropractic, physical therapy, and acupuncture, and (b) referrals to specialists and for wholly unnecessary diagnostic testing.

1. **Fraudulent Physician Services**

228. In connection with patients of the Flushing Clinic, Rosenblatt allegedly provided—and then he and/or ORD billed Allstate for—a variety of physician services, including (a) initial consultations and examinations, (b) follow-up examinations, (c)

36

electrodiagnostic testing, and (d) pain management services such as epidural steroid injections and paraspinal nerve root block injections.

229.    The services purportedly provided by Rosenblatt to patients of the Flushing Clinic were not rendered based upon the subjective need of any patient, but rather were used to (a) maximize the charges submitted to Allstate, and (b) provide justification for the excessive treatment provided pursuant to the defendants' wrongful patient referral arrangements and pre-determined treatment protocol.

### a.    *Misrepresentation of Examination Findings*

230.    The initial consultation reports submitted to Allstate by Rosenblatt and/or ORD conclude that virtually every one of the Flushing Clinic patients sustained soft-tissue injuries, radiculopathies, and/or herniations that necessitate a treatment plan that includes, in many instances, conservative therapy as well as MRIs and other diagnostic testing.

231.    Many of the initial consultation reports even conclude—at the patient's very first visit—that the patient requires electrodiagnostic testing.

232.    In fact, several patients of the Flushing Clinic received electrodiagnostic testing at their very first visit.

233.    Further, the follow-up examination reports submitted to Allstate by Rosenblatt and/or ORD conclude that virtually every one of Flushing Clinic patients must (a) continue the course of therapy, (b) obtain additional radiologic imaging studies or diagnostic testing, and/or (c) consult with a specialist (i.e. orthopedist).

234.    The course of treatment prescribed to Flushing Clinic patients by Rosenblatt was designed for the purpose of maximizing the charges to Allstate—and not to benefit the treatment of any patient.

235. Each action taken by Rosenblatt when treating Flushing Clinic patients was designed to support the need for the previous service and justify the treatment slated to be provided next.

236. As a result of this unlawful conduct, none of the services billed to Allstate by Rosenblatt and/or ORD are compensable under New York law.

**b.** ***Fraudulent Electrodiagnostic Testing***

237. An integral part of the defendants' scheme involved the fraudulent provision of (and billing for) electrodiagnostic ("EDX") testing.

238. The term EDX testing refers to electromyography tests ("EMGs") and nerve conduction studies ("NCSs") (which include "F-Wave" and "H reflex" studies).

239. Generally, EDX testing is utilized as part of the clinical evaluation of patients with disorders of the peripheral and/or central nervous system. EDX tests are often utilized to help a practitioner evaluate symptoms, arrive at a proper diagnosis, and monitor patient response to treatments.

240. EDX testing, such as NCSs, and EMGs, should not be administered uniformly across patient populations; rather, the decision of which nerves, nerve roots, and/or muscles to test should be individually tailored to address the specific circumstances of each patient.

241. EDX tests, such as NCSs and EMGs, are dynamic procedures, meaning that the process in which these tests are administered should change during the tests as new information is obtained.

242. As explained below, however, Rosenblatt never tailored the EDX tests to the unique circumstances of any Flushing Clinic patient.

243.    Instead, virtually every patient treated by Rosenblatt at the Flushing Clinic received NCSs and EMGs on the same exact nerves and muscles.

244.    Rosenblatt also routinely exceeded the number of tests reasonable and necessary to evaluate each patient that he treated at the Flushing Clinic.

245.    For example, all such patients were subjected to EDX tests consisting of (a) NCSs of at least 14-18 motor and sensory nerves, (b) multiple F-wave and H reflex studies, and (c) EMGs of all 4 limbs.

246.    Overall, patients treated by Rosenblatt at the Flushing Clinic were subjected to NCSs and EMGs that were identical, and Rosenblatt's provision of testing in this manner was wholly unnecessary to evaluate and assess each patient's condition.

247.    Not only was such testing unnecessary, but it also (a) inflated the charges submitted to Allstate, and (b) placed the patients at additional—and unwarranted—physical risk of injury.

i.    *Fraudulent NCS Protocol*

248.    NCSs are non-invasive studies in which peripheral nerves are stimulated with electrical currents.

249.    The velocity, amplitude, and shape of the response are then recorded by electrodes attached to the skin, and are compared with well-defined normal parameters and responses to identify the existence, nature, extent, and specific location of any abnormal sensory or motor nerve fibers.   In short, NCSs confirm that the peripheral nerves are functioning normally.

250.    The selection and number of nerves studied during an NCS should vary from patient-to-patient.

251.    In other words, in a legitimate clinical setting, every patient's abnormal NCS should involve the testing of some different specific nerves.

252.    The NCSs administered by Rosenblatt to Flushing Clinic patients involved no such variation.

253.    According to the American Medical Association ("AMA"), the utilization of dynamic decision-making is a prerequisite for the use of electrodiagnostic Current Procedural Terminology ("CPT") codes.

254.    Moreover, the proper administration of EDX tests requires, among other things, dynamic decision making by the provider regarding the design and scope of the tests. Specifically, the AMA states:

> [T]here is no single, universally accepted, specific protocol or set of procedures employed for each diagnostic category. Instead, the EDX provider must continually reassess the findings encountered during the performance of the EDX testing . . .

*CPT Assistant*, Vol. 12, Issue 4, April 2002.

255.    Contrary to these requirements, however, the NCSs administered by Rosenblatt to Flushing Clinic patients were never tailored to the unique circumstances of any patient, nor were they tailored or modified based on findings obtained from previously-tested nerves.

256.    Instead, virtually every patient treated by Rosenblatt at the Flushing Clinic received an NCS on the same nerves and nerve fibers.

257.    Crucially, Rosenblatt has admitted to utilizing a standardized protocol when administering NCSs to patients treated at the Flushing Clinic.

258.    Even if every patient treated by Rosenblatt at the Flushing Clinic actually required an NCS (which they did not), it is virtually impossible that every patient would require the same

number of tests on the same specific nerves given the unique physical characteristics and conditions of each individual patient, particularly if these patients had nerve damage as alleged.

259.     Rosenblatt's utilization of a standardized, protocol approach to NCSs administered to patients that treated at the Flushing Clinic serves no meaningful medical purpose, and Rosenblatt's testing protocols are designed and implemented solely to maximize profit, rather than to aid in the evaluation and treatment of patients.

260.     Accordingly, Rosenblatt's protocol approach to NCS testing—combined with (a) his gross overuse of these tests, and (b) his failure to properly interpret the tests—demonstrates and exemplifies why all of the charges submitted to Allstate in connection with NCSs administered by Rosenblatt to patients that treated at the Flushing Clinic are fraudulent and non-compensable under New York's No-Fault law.

261.     The claims listed in Exhibit 2 demonstrate a clear pattern of Rosenblatt's use of a specific protocol for the use of NCSs.

262.     Accordingly, the NCSs administered to the patients listed in Exhibit 2 were excessive and not warranted by the condition of the patient, and each charge submitted by Rosenblatt and/or ORD in connection with these services is not compensable under New York's No-Fault laws.

263.     To the extent that Allstate paid Rosenblatt and/or ORD in reliance on the documents created and submitted in connection with the NCSs itemized in Exhibit 2, Allstate is entitled to recover all payments made to Rosenblatt and/or ORD in connection with these services.

264.     Moreover, to the extent that any of the charges submitted in connection with these studies remain unpaid (including, but not limited to, the claims identified in the chart annexed at

Exhibit 2), Allstate is under no obligation to make any payments in connection with those transactions because these studies were excessive and not warranted by the condition of the patient, and thus are not compensable under New York's No-Fault laws.

ii. <u>*Fraudulent EMG Protocol*</u>

265.    EMGs measure the electrical activity of muscles, and are often done in connection with NCSs.

266.    EMGs involve the insertion of a needle into various muscles in the spinal area ("paraspinal muscles"), and in the arms and/or legs to measure electrical activity in each muscle.

267.    There are many different muscles in the arms and legs that can be tested with EMGs.

268.    In a legitimate clinical setting, the decision concerning the extent of a particular patient's EMG test is determined based on a history and detailed neurological and physical examination of the individual patient, along with an analysis of the real time results obtained during the EMG and the NCS.

269.    Like NCSs, the number of limbs and the specific muscles tested during EMGs should vary from patient to patient, and the decision concerning the number of limbs and muscles to study in each test must be tailored to each patient's unique circumstances.

270.    What constitutes a reasonable and appropriate EMG for one patient is not the same as for the next patient.

271.    In other words, EMGs should never be administered pursuant to a pre-determined protocol that dictates the number of muscles to be tested.

272.     Likewise, in a legitimate clinical setting, EMGs administered to different patients should vary in terms of the specific muscles involved in each test, especially in the cases of patients whose EMGs result in abnormal findings

273.     Contrary to these norms, however, Rosenblatt never tailored the performance of these EMG tests to the unique circumstances and findings of any patient.

274.     Instead, the EMGs administered to each patient treated by Rosenblatt at the Flushing Clinic involved the following muscles, regardless of the patients' clinical presentation and suspected nerve root(s) involved:

- Upper limbs: deltoid, biceps, triceps, brachioradialis, first dorsal interosseous, and abductor pollicis brevis; and
- Lower limbs: quadriceps, hamstrings, gluteus medius, tibialis anterior, gastrocsoleus, and extensor digitorum brevis.

275.     Even if every patient treated by Rosenblatt at the Flushing Clinic actually required EMGs (which they did not), it is virtually impossible that every patient would require the same number of tests on the same specific nerves given the unique physical characteristics and conditions of each individual patient, particularly if these patients sustained electrodiagnostic abnormalities as alleged.

276.     Rosenblatt's utilization of a standardized, protocol approach to EMGs administered to Flushing Clinic patients serves no meaningful medical purpose, and Rosenblatt's testing protocols are designed and implemented solely to maximize profit, rather than to aid in the evaluation and treatment of patients.

277.     Accordingly, Rosenblatt's protocol approach to administering EMGs—combined with (a) his gross overuse of these tests, and (b) his failure to properly interpret the tests— demonstrates and exemplifies why all of the charges submitted to Allstate in connection with

EMGs administered by Rosenblatt to Flushing Clinic patients are fraudulent and non-compensable under New York's No-Fault law.

278.    The claims listed in Exhibit 3 demonstrate a clear pattern of Rosenblatt's use of a specific protocol for the use of EMGs.

279.    Accordingly, the EMGs administered to the patients listed in Exhibit 3 were excessive and not warranted by the condition of the patient, and each charge submitted by Rosenblatt and/or ORD in connection with these services is not compensable under New York's No-Fault laws.

280.    To the extent that Allstate paid Rosenblatt and/or ORD in reliance on the documents created and submitted in connection with the EMGs itemized in Exhibit 3, Allstate is entitled to recover all payments made to Rosenblatt and/or ORD in connection with these services.

281.    Moreover, to the extent any of the charges submitted in connection with these studies remain unpaid (including, but not limited to, the claims identified in the chart annexed at Exhibit 3), Allstate is under no obligation to make any payments in connection with those transactions because these studies were excessive and not warranted by the condition of the patient, and thus are not compensable under New York's No-Fault laws.

iii.    *Fraudulent F-Wave Protocol*

282.    F-Wave studies are performed to evaluate motor nerve conduction in portions of the nerve that are closest to the spine, and provide limited information in the evaluation of radiculopathies.

283.    These studies are performed by stimulating motor nerves through supramaximal stimulation, which produces an action potential by the muscle(s) supplied by the nerve. The

action potential is measured by electrodes attached to the patient's skin, and is recorded by the EMG machine.

284.    To find any information of medical significance, each F-Wave study must consist of, at a bare minimum, ten (10) separate instances of nerve stimulation (i.e. the patient is subjected to a rapid series of at least ten (10) strong electrical shocks).

285.    Moreover, even where F-Wave studies properly administered and ten (10) stimulations are performed, such testing provides little information that is not already revealed by EMGs, as both tests measure the function of motor axons. Moreover, EMG testing has been proven to be significantly more accurate in detecting radiculopathy than F-Wave studies.

286.    Accordingly, the F-Wave studies administered to patients treated by Rosenblatt at the Flushing Clinic were wholly unnecessary, especially because the studies were provided to virtually every patient in the same manner.

287.    However, even if these F-Wave studies were warranted and medically necessary, Rosenblatt's and/or ORD's charges for these services are still not compensable because the studies were performed in a grossly excessive manner.

288.    In the far majority of cases, a maximum of three (3) F-Wave studies is sufficient.

289.    Here, virtually every patient treated by Rosenblatt at the Flushing Clinic received eight (8) F-Wave studies as part of their EDX testing.

290.    There is no medically-acceptable reason to perform this number of F-Wave studies on one patient, let alone on nearly the defendants' entire patient population.

291.    Additionally, in virtually every case, the performance of F-Wave studies was not indicated based on the patient's documented history and physical examination.

292.     As such, these studies were excessive and lacked medical necessity, and are thus not compensable under New York's No-Fault Laws.

293.     The claims listed in Exhibit 4 demonstrate a clear pattern of Rosenblatt's gross overutilization of F-Wave studies.

294.     Accordingly, the F-Wave studies administered to the patients listed in Exhibit 4 were excessive and not warranted by the condition of the patient, and each charge submitted by Rosenblatt and/or ORD in connection with these services is not compensable under New York's No-Fault laws.

295.     To the extent that Allstate paid Rosenblatt and/or ORD in reliance on the documents created and submitted in connection with the F-Wave studies itemized in Exhibit 4, Allstate is entitled to recover all payments made to Rosenblatt and/or ORD in connection with these services.

296.     Moreover, to the extent any of the charges submitted in connection with these studies remain unpaid (including, but not limited to, the claims identified in the chart annexed at Exhibit 4), Allstate is under no obligation to make any payments in connection with those transactions because these studies were excessive and not warranted by the condition of the patient, and thus are not compensable under New York's No-Fault laws.

iv.     *Fraudulent H-Reflex Protocol*

297.     The submaximal stimulation of some mixed nerves (i.e., those nerves that contain both motor and sensory fibers) causes an "H reflex" to occur.

298.     Although the H reflex can be performed in more than one mixed nerve, the test is most practical clinically at the S1 level when stimulating the tibial nerve, or for finding evidence of unilateral radiculopathy in this region.

299. Accordingly, the H reflex is rarely performed in other mixed nerves, except for research purposes.

300. In fact, it is not medically necessary to perform H reflex testing in every lower limb EDX study because a standard NCS/EMG test is more than adequate for diagnosing unilateral radiculopathy at the S1 level.

301. However, Rosenblatt routinely administered H reflex testing regardless of the patient's condition, and Rosenblatt made no attempt to determine whether H reflex testing was actually necessary.

302. In reality, the far majority of the patients treated by Rosenblatt at the Flushing Clinic did not have clinical findings suggesting S1 radiculopathy on either side, and thus H reflex testing was not medically necessary.

303. Likewise, in cases where Rosenblatt reported physical examination findings that would justify H reflex testing (e.g., reduced Achilles reflex), the far majority of these patients' H reflex tests were normal.

304. The presence of normal H reflex test results in these patients suggests that Rosenblatt misrepresented the patients' physical examination findings because these patients' H reflex tests should have returned abnormal results if their physical examination findings were accurate.

305. Overall, Rosenblatt subjected patients to medically unnecessary H reflex testing, and/or Rosenblatt exaggerated and/or falsified patients' physical examination findings as a means to justify the administration of H reflex testing.

306. Accordingly, because the H reflex testing administered by Rosenblatt to Flushing Clinic patients was not medically necessary and/or was predicated upon exaggerated/falsified

findings, each charge submitted by Rosenblatt and/or ORD in connection with these services is not compensable under New York's No-Fault laws, including the H reflex tests administered to the patients listed in Exhibit 5.

307. To the extent that Allstate paid Rosenblatt and/or ORD in reliance on the documents created and submitted in connection with the H reflex tests itemized in Exhibit 5, Allstate is entitled to recover all payments made to Rosenblatt and/or ORD in connection with these services.

308. Moreover, to the extent any of the charges submitted in connection with these studies remain unpaid (including, but not limited to, the claims identified in the chart annexed at Exhibit 5), Allstate is under no obligation to make any payments in connection with those transactions because these tests were excessive and not warranted by the condition of the patient, and thus are not compensable under New York's No-Fault laws.

## 2. Fraudulent Chiropractic Services

309. The chiropractic services provided to Flushing Clinic patients by Yom were not individualized to the specific needs of any patient.

310. Instead, the services were unnecessary and excessive, and thus are not compensable under New York law.

311. As detailed herein, Yom provided chiropractic services pursuant to the defendants' fraudulent treatment protocol, which was designed to maximize financial enrichment at the expense of patient care.

312. First, Yom uniformly "cloned" his chiropractic examination reports and treatment notes.

313. The Centers for Medicare & Medicaid Services ("CMS") defined "cloned documentation" as the following:

> Documentation is considered cloned when it is worded exactly like or similar to previous entries. It can also occur when the documentation is exactly the same from patient to patient. Individual patient notes for each patient encounter are required. Documentation must reflect the patient condition necessitating treatment, the treatment rendered and if applicable the overall progress of the patient to demonstrate medical necessity.

National Government Services, *Part B/Education & Training/Policy Education*, August 2012.

314. For example, Yom routinely "copied and pasted" the patients' subjective complaints, examination findings, past medical histories, diagnoses, prognoses, treatment plans, and referrals—from week to week for each patient and across patients.

315. Even though the Flushing Clinic patients had different mechanisms of injury, ages, genders, past medical histories, and pre-existing conditions, Yom reported that nearly every patient had the same injuries, past medical histories, examination findings, clinical impressions, and assessments.

316. Additionally, for nearly every Flushing Clinic patient Yom delivered the same set of diagnoses and prognoses, and then gave the same set of goals, plans, recommendations, diagnostic test orders, and physician referrals.

317. For example, Yom reported virtually identical injuries, complaints, examination findings, past medical histories, diagnoses, prognoses, treatment goals, treatment plans, and referrals for the following patients despite the clear variation among the patients' ages, genders, and mechanisms of injury:

| Patient Name | Claim No. | Patient Age | Patient Gender | Mechanism of Injury |
|---|---|---|---|---|

| Patient Name | Claim No. | Patient Age | Patient Gender | Mechanism of Injury |
|---|---|---|---|---|
| S. J. H. | 0156793614 | 41 | Female | Front seat passenger in rear-impact collision |
| J. N. K. | 0197406044 | 47 | Male | Driver in a front-end collision |
| T. P. L. | 0275678126 | 25 | Male | Front seat passenger in side-swipe collision |

318.    If Yom's findings were legitimate, the variation among the ages, genders, and mechanisms of injury of these patients should have resulted in different clinical features and findings for each patient.

319.    However, the wording of Yom's initial examination reports for these patients is identical, including the same typographical errors.

320.    For example, in the "Assessment" section of Yom's reports for these patients, the word "complaint" is misspelled as "complains," and the word "lordosis" is misspelled as "lordorsis."

321.    If Yom did not routinely clone his patient notes, the patients' actual symptoms, complaints, and progress would have been documented.

322.    However, because Yom subjected all of his patients to the same predetermined protocol, the patients' actual conditions were irrelevant.

323.    Overall, Yom purposely created his patient treatment notes in this manner to justify further (and excessive) treatment by the other Healthcare Provider Defendants and the Entity Defendants.

324. Yom also engaged in other misconduct, all of which demonstrates that Yom's provision of patient services was financially motivated, including the following: (a) failing to follow treatment recommendations in a consistent or thorough fashion; (b) failing to monitor patient progress at re-examinations or adjust the list of potential diagnoses; (c) failing to review or utilize the results of diagnostic testing in setting the course of treatment; (d) failing to communicate or coordinate care with the other Healthcare Provider Defendants and the Entity Defendants; (e) failing to substantiate claimed possible injuries and/or diagnoses with either subjective or objective clinical parameters; (f) failing to report vital signs in a manner that would offer any quantitative or qualitative clinical data; and (g) failing to profile the medical necessity and actual performance of skilled intervention services.

325. Yom also exaggerated and/or fabricated his patients' conditions in his chiropractic examination reports and treatment notes.

326. For example, every Flushing Clinic patient is listed as being in severe pain (i.e., 8-10 on a scale of 1-10) at almost every office visit, suffering from anxiety and/or irritability, severely limping, and suffering severe muscle spasms.

327. Such serious injuries are inconsistent with the relatively minor car accidents in which these patients were purportedly involved.

328. Further, Yom's subjective and objective examination findings almost always contradict the findings made by the other Healthcare Provider Defendants and the Entity Defendants, even when the same patients are treated contemporaneously.

329. For example, Yom documents almost every patient as having normal or diminished sensation, while Rosenblatt documents those same patients as being hypersensitive.

330.     Moreover, Yom documents almost every patient as having normal motor strength, while Rosenblatt documents those same patients as having significant motor weakness

331.     Additionally, significant findings documented in MRI reports, such as ACL tears and supraspinatus tears, are not reflected in Yom's examination reports or treatment notes.

332.     There is no legitimate explanation for why Yom consistently makes patient-specific findings that are contradicted by the other Healthcare Provider Defendants and the Entity Defendants.

333.     Rather, it appears likely that Yom's practice of simply "copying and pasting" the same exam findings among all of his patients caused him to misrepresent the actual condition of these patients in the examination reports and treatment notes submitted to Allstate, resulting in said contradictions.

334.    Because Yom does not record any clinical correlation, communication, or clarification for or with the other Healthcare Provider Defendants and the Entity Defendants to address these inconsistencies, it is clear that Yom purposely fails to coordinate care with the other providers at the Flushing Clinic.

C.     **FRAUDULENT BILLING CONDUCT**

1.     **Fraudulent Billing of F-Wave Studies**

335.     To find any information of medical significance, each F-Wave study must consist of, at a bare minimum, ten (10) separate instances of nerve stimulation (i.e., the patient must be subjected to a rapid series of at least ten (10) strong electrical shocks).

336.     Indeed, according to the AMA's *CPT Manual*, a minimum of ten (10) F-Wave stimulations must be recorded per F-Wave study to allow the practitioner to make a medically-sound determination concerning each patient's condition.

337. Failure to perform the minimum number of stimulations essentially returns no valid data for the medical provider to use for clinical diagnostic purposes.

338. Despite this, Rosenblatt only recorded two to four (2-4) stimuli per F-Wave study—which is far below the minimum standard.

339. In fact, when questioned, Rosenblatt (a) admitted that he performs less than ten (10) F-Wave stimulations per F-Wave study, (b) claimed that he performs a minimum of three (3) stimulations per F-Wave study, and (c) alleged that ten (10) stimulations is neither medically required nor suggested, but is merely a "parameter for billing."

340. The AMA defines the meaning of the CPT codes.

341. When a provider bills for F-Wave testing under CPT Code 95903, that provider represents that he or she performed the test as required by the CPT code.

342. When a provider performs less than ten (10) F-Wave stimulations and then submits an invoice for the test under CPT Code 95903, the provider bills for a service that was not actually rendered.

343. Moreover, when a provider fails to perform the minimum number of F-Wave stimulations, the test is rendered clinically worthless. Furthermore, the results of improperly performed F-Wave tests (i.e., tests with less than ten (10) stimulations) can be clinically misleading.

344. In every case that Rosenblatt failed to perform the requisite number of F-Wave stimulations, it is clinically impossible to derive any medically significant information from these tests.

345. These F-Wave studies were performed as part of the defendants' protocol approach to EDX testing—an approach that failed to assess, diagnose, or treat any particular patient's condition or electrodiagnostic findings.

346. Accordingly, the results of all such F-Wave tests are invalid and useless for clinical diagnostic purposes, including, but not limited to, those tests identified in the chart annexed at Exhibit 4.

347. Overall, these studies were neither reasonable nor medically necessary, and are thus not compensable under New York's No-Fault Laws.

**2.** **Fraudulent Billing for NCS**

348. In addition to providing identical and excessive NCS testing to patients of his Flushing Clinic practice pursuant to a pre-determined protocol, the NCS testing billed to Allstate by Rosenblatt is not compensable because it was falsely billed in several respects.

349. Under CPT Code 95904, a provider may bill an insurer one (1) unit for each sensory nerve tested through an NCS.

350. Specifically, CPT Code 95904 permits reimbursement for "[n]erve conduction, amplitude and latency/velocity, ***each nerve***; sensory." (Emphasis added.)

351. Despite this, in many instances, Rosenblatt billed Allstate for eight (8) units of testing under CPT Code 95904 although only six (6) sensory nerves were tested.

352. Additionally, in many instances, Rosenblatt falsely billed Allstate for two (2) units of motor nerve testing without F-Waves under CPT Code 95900, which permits reimbursement for "[n]erve conduction, amplitude and latency/velocity, each nerve; motor, ***without F-Wave study***." (Emphasis added.)

353. However, Rosenblatt performed F-Wave studies in each motor nerve test provided to patients of his Flushing Clinic practice and thus none of the charges under CPT 95900 are legitimate or compensable under New York's No-Fault Laws.

354. The chart annexed as Exhibit 2 identifies NCS reports created and submitted to Allstate that were falsely billed.

### 3. Fraudulent Billing for H Reflex Tests

355. Rosenblatt also improperly billed for H reflex tests.

356. Under the Fee Schedule, H reflex tests are billed under CPT Codes 95934 and 95936.

357. When billing bilateral H reflex studies, a -50 modifier should be used to indicate that the study was performed bilaterally.

358. Despite this, Rosenblatt billed Allstate twice under CPT Codes 95934 and/or 95936 when performing bilateral H reflex tests. This was likely done because under the Fee Schedule, a bilateral H reflex test billed under either CPT Code 95934-50 or 95936-50 results in a charge of $179.99, whereas submitting charges for two separate H reflex tests under either CPT Code 95934 or 95936 results in a charge of $239.98.

359. The chart annexed as Exhibit 5 identifies H reflex reports created and submitted to Allstate that are fraudulent and not compensable.

360. Accordingly, to the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these testing services, Allstate is entitled to recover payments made to the defendants in connection with these testing services.

361. Moreover, to the extent any of the charges submitted in connection with these testing services remain unpaid, Allstate is under no obligation to make any payments in

connection with those transactions because the charges submitted by the defendants in connection with the testing services are not compensable under New York's No-Fault laws for the reasons set forth above.

### 4. Fraudulent Billing for EMGs

362. Under the New York Workers' Compensation Medical Fee Schedule ("Fee Schedule"), EMG tests performed with NCS are billed under CPT Code 95886, which permits charges for "Needle electromyography, each extremity, with related paraspinal areas, ***when performed, done with nerve conduction, amplitude and latency/velocity study***; complete, 5 or more muscles studied, innervated by 3 or more nerves or 4 or more spinal levels (List separately in addition to code for primary procedure)." (Emphasis added.)

363. In contrast, CPT Codes 95861-95864 are used to bill for EMG tests performed without NCS studies.

364. In this case, the EMG tests billed to Allstate by Rosenblatt and/or ORD were falsely billed.

365. Specifically, Rosenblatt and ORD routinely billed Allstate for these services under CPT Code 95864, despite the fact that each EMG test was performed with NCS and therefore should have been billed under CPT Code 95886.

366. This was likely done because under the Fee Schedule, an EMG test billed under CPT Code 95864 results in a charge of $408.64, whereas an EMG test (that is performed with an NCS study) billed under CPT Code 95886 results in a charge of $154.38.

### 5. Fraudulent Billing for Physician Follow-up Examinations

367. In certain instances, Rosenblatt rendered EDX testing during a patient's first office visit after performing the initial examination, while in other instances, Rosenblatt simply

56

examined the patient at the first visit and then required the patient to return to the Flushing Clinic on a later date to undergo EDX testing.

368.    However, when the patient returned to the Flushing Clinic to receive said EDX testing, Rosenblatt also billed Allstate for a follow-up examination (under CPT Codes 99212-99215) of that patient.

369.    The purpose of performing a history and physical examination prior to performing an EDX study is to develop a differential diagnosis so that an appropriate EDX study can be designed to evaluate for the etiology of the patient's pain.

370.    Therefore, it was inappropriate for Rosenblatt to bill Allstate for a second examination at the follow-up visit because Rosenblatt had already examined these patients at their initial office visits and had developed a differential diagnosis which he could use to design an appropriate EDX study.

371.    Virtually every patient treated by Rosenblatt under his own name or through ORD at the Flushing Clinic underwent at least one unnecessary follow-up examination during their course of treatment.

372.    Also, as discussed above, Rosenblatt employed a protocol approach to EDX testing.

373.    Specifically, Rosenblatt tested the same battery of nerves on every patient who received an NCS, and he also tested the exact same muscles in every patient in every EMG test, regardless of the patients' clinical presentation.

374.    Thus, because Rosenblatt purportedly examined these patients to develop an individually tailored EDX study, yet his patients' clinical presentations clearly had no impact on the nerves and muscles tested in the EDX study—these examinations were worthless.

57

375. Further, in certain instances, Rosenblatt falsely inflated and purposely misrepresented the charges submitted to Allstate by billing for follow-up examinations under CPT Code 99215.

376. The criteria developed by the AMA to properly assign CPT Code 99215 to a service include a number of components and factors, with history, physical examination, and medical decision-making being the three (3) key components.

377. To warrant a medical bill demanding payment for a service billed under CPT Code 99215, the CPT codebook requires at least two of the following: (a) a comprehensive history; (b) a comprehensive examination; and (c) medical decision-making of high complexity.

378. Typically, for a follow-up examination to be billed under CPT Code 99215, the patient must present with a problem of moderate to high severity.

379. Follow-up examinations billed under CPT Code 99215 also typically require the physician to spend forty (40) minutes face-to-face with the patient and/or family.

380. The factors considered to determine the "complexity of medical decision-making" in arriving at a proper CPT Code assignment include:

| | NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS | AMOUNT AND/OR COMPLEXITY OF DATA TO BE REVIEWED | RISK OF COMPLICATIONS AND/OR MORBIDITY OR MORTALITY |
|---|---|---|---|
| **CPT Code 99215** | Extensive | Extensive | High |

381. Here, the clinical documentation submitted to Allstate by, or on behalf of, Rosenblatt fails to establish any of the elements required to sustain a charge under CPT Code 99215—a comprehensive history, a comprehensive examination, or medical decision-making of high complexity.

382. Further, under the Fee Schedule, CPT Code 99215 is deemed an "evaluation and management" ("E/M") code. Ground Rule 25 of the Fee Schedule instructs that when a provider bills for an E/M service on the same date of service as EDX testing, the provider must indicate that the E/M charge represents a significant, separately identifiable service beyond the evaluation and management encompassed in the codes designated for EDX testing by attaching the '-25' modifier to the E/M code.

383. Despite this, Rosenblatt and/or ORD never used the '-25' modifier when billing Allstate for follow-up examinations under CPT Code 99215 performed on the same date of service as EDX testing.

384. Finally, as stated above, the follow-up examination reports submitted to Allstate by Rosenblatt/ORD conclude that virtually every one of the defendants' patients/Allstate claimants must continue therapy (with the PC Defendants), receive additional treatment or studies, and/or consult with a specialist, regardless of the patient's actual physical condition.

385. These statements were intentionally included in Rosenblatt's examination reports in order to support the treatment slated to be provided next in the scheme—not because the defendants' patients actually required continued treatment and/or referrals.

386. The chart annexed at Exhibit 6 identifies all of the patients treated by Rosenblatt under his own name or through ORD who purportedly received excessive, unnecessary, and/or improperly billed follow-up examinations.

387. Because (a) the follow-up examinations were wholly unnecessary to arrive at a differential diagnosis, (b) these examinations were nothing more than a product of the defendants' scheme to inflate patient charges through the provision of excessive and unnecessary services, and (c) in certain instances, the services were falsely charged, the defendants are not entitled to collect payment for such services under New York's No-Fault laws.

388. Accordingly, to the extent that Allstate paid the defendants in reliance on the documents created and submitted in connection with these patient follow-up examinations, Allstate is entitled to recover all payments made to the defendants in connection with the follow-up examinations whereas the nature and extent of the examinations were materially represented and the services were falsely charged.

389. Moreover, to the extent any of the charges itemized in Exhibit 6 remain unpaid or have been denied, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by the defendants in connection with these services are not compensable under New York's No-Fault laws for the reasons set forth above.

**6.      Fraudulent Billing for Chiropractic Follow-up Examinations**

390. Yom routinely billed Allstate for unnecessary chiropractic follow-up examinations under CPT Code 99213.

391. None of the chiropractic follow-up examinations billed to Allstate by Yom are compensable because the documentation submitted to support these patient visits fails to document the necessity of a separate examination beyond the usual pre-service and post-service work associated with chiropractic and acupuncture services.

392. In fact, the documentation submitted to Allstate in support of these services fails to support that the follow-up examinations were even performed, especially given the "cloned" nature of Yom's examination reports and treatment notes.

393. None of the practices outlined above reflects the conduct of a healthcare provider rendering treatment with the primary purpose of effectively treating his patients. Rather, such conduct reflects a healthcare provider rendering treatment for financial gain at the expense of effectively treating his patients' conditions.

394. Because all of the services provided by Yom, including the chiropractic follow-up examinations, were clinically unnecessary, excessive, and provided pursuant to a predetermined protocol, each charge submitted to Allstate in connection with these chiropractic follow-up examinations is not compensable under New York's No-Fault laws.

395. The chart annexed as Exhibit 7 identifies charges for chiropractic follow-up examinations submitted to Allstate that are not compensable.

396. Accordingly, to the extent that Allstate paid the defendants in reliance on the documents created and submitted in connection with these services, Allstate is entitled to recover payments made to the defendants in connection with these services.

397. Moreover, to the extent any of the charges submitted in connection with these services remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with the services are not compensable under New York's No-Fault laws for the reasons set forth above.

D. UNLAWFUL BILLING FOR SERVICES PROVIDED BY INDEPENDENT CONTRACTORS

398. To be eligible for reimbursement under the No-Fault Laws, a professional corporation is entitled to payment from an insurer only if, *inter alia*, the professional corporation—through an owner or employee thereof—is the actual provider of the billed-for services.

399. A healthcare provider's use of independent contractors, rather than employees, to provide healthcare services renders the provider ineligible to receive reimbursement under the No-Fault Laws. *See* DOI Opinion Letters, annexed hereto as Exhibit 8.

400. Throughout the relevant period, ORD and/or Rosenblatt has submitted bills to Allstate that include charges for services provided by independent contractors.

401. On virtually all—if not all—of the assignment of benefits forms, medical reports, and bills submitted to Allstate by ORD and/or Rosenblatt, Rosenblatt is identified as the individual who rendered the physician services.

402. Despite this, Rosenblatt admitted that Joseph Jacques ("Jacques"), a neuro-diagnostic technician, performs 99% of the NCSs billed by ORD and/or Rosenblatt.

403. Moreover, Rosenblatt also admitted that Jacques is an independent contractor who was paid on a 1099 basis, rather than a salaried or W-2 employee. According to Rosenblatt, he hired Jacques through a contractor agency named "South Shore Neurodiagnostic," and he paid Jacques through the agency.

404. Bank records produced to Allstate by Rosenblatt/ORD confirm that Rosenblatt made payments to South Shore Neurodiagnostic, and do not reveal any direct payments to Jacques.

405. Moreover, despite Rosenblatt's admission that Jacques performs nearly all NCSs billed by Rosenblatt/ORD, Rosenblatt submitted a form to Allstate in connection with virtually

every NCS test that he billed that states that "Dr. Rosenblatt performs and interprets the entire test." *See* Exhibit 9 for a sample selection of these forms.

406. Because such physician services were rendered by an independent contractor, ORD and/or Rosenblatt was never the direct provider of the healthcare services that were billed to Allstate.

407. Accordingly, in all such instances, ORD and/or Rosenblatt was completely ineligible to receive reimbursement for those billed-for services under New York's No-Fault laws.

## VI.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

408. Throughout the course of this entire scheme, J. Kim, S. Kim, Yom, Rosenblatt, D. Kim, and Chun, working through the Entity Defendants and/or through 153 Plaza, (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

409. Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, letters and requests for payment in connection with the insurance claims referenced throughout this pleading (and accompanying exhibits) traveled through the U.S. Mail.

410. Every automobile insurance claim detailed within this Complaint involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial

policies, insurance payments, claim-related payments, and the return of the cancelled payment instruments to the financial institution(s) from which the draft(s) were drawn.

A. **ORD ENTERPRISE**

411. In conducting the affairs of the ORD enterprise, Yom, Rosenblatt, Chun, D. Kim, S. Kim, and J. Kim either (a) personally used the U.S. Mail to further their scheme by causing patient records and bills/invoices from ORD to be mailed to Allstate and/or counsel for the claimants, or (b) acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of ORD's business.

412. At all relevant times, Yom, Rosenblatt, Chun, D. Kim, S. Kim, and J. Kim caused ORD to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that ORD mailed (or was caused to mail) a demand for payment (i.e., invoice or statutory NF-3 claim form) to Allstate.

413. Yom's, Chun's, D. Kim's, S. Kim's, and J. Kim's participation in the operation, management, and/or control of ORD, as persons not licensed or otherwise authorized to provide physician services, rendered ORD completely ineligible for No-Fault reimbursement under New York law.

414. Because Yom, Chun, D. Kim, S. Kim, and J. Kim participated in the operation, management, and/or control of ORD, Yom, Chun, D. Kim, S. Kim, J. Kim, and Rosenblatt purposely caused ORD to make a misrepresentation each and every time that ORD mailed (or was caused to mail) a document (i.e., invoice or statutory NF-3 claim form) to Allstate claiming eligibility for reimbursement.

415. Moreover, because (a) Yom, Chun, D. Kim, S. Kim, and J. Kim participated in conducting the affairs of ORD and received ORD's professional physician fees and profits, (b)

Yom, Chun, D. Kim, S. Kim, J. Kim, and Rosenblatt purposely caused ORD to seek No-Fault reimbursement from Allstate (even though ORD was not lawfully entitled to such reimbursement), (c) Yom, Chun, D. Kim, S. Kim, J. Kim, and Rosenblatt purposely caused ORD to seek No-Fault reimbursement from Allstate for falsely billed and provided medical services, and (d) ORD used the U.S. Mail to seek reimbursement, it is clear that Yom, Chun, D. Kim, S. Kim, J. Kim, and Rosenblatt committed mail fraud.

416.    At all relevant times, Yom, Chun, D. Kim, S. Kim, J. Kim, and Rosenblatt knew that ORD, ORD's billing companies and/or agents, including, but not necessarily limited to, Chun, a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by ORD.

417.    Allstate estimates that the unlawful operation of the ORD enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed as Exhibit 10 and incorporated herein by reference as if set forth in its entirety.

## B.    K<span style="font-variant:small-caps">IM</span> PT

418.    In conducting the affairs of the Kim PT enterprise, Yom, D. Kim, Chun, S. Kim, and J. Kim either (a) personally used the U.S. Mail to further this scheme by causing patient records and bills/invoices from Kim PT to be mailed to Allstate and/or counsel for the claimants, or (b) acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of Kim PT's business.

419.    At all relevant times, Yom, D. Kim, Chun, S. Kim, and J. Kim caused Kim PT to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws

each time that Kim PT mailed (or was caused to mail) a demand for payment (i.e., invoice or statutory NF-3 claim form) to Allstate.

420.    Yom's, D. Kim's, Chun's, S. Kim's, and J. Kim's conduct of causing Kim PT to (a) share professional fees and profits with one or more non-licensed layperson, (b) participate in unlawful patient referral and/or financial arrangements with one or more of the Healthcare Provider Defendants and/or Entity Defendants, and (c) seek and collect No-Fault benefit payments in connection with excessive and clinically unnecessary physical therapy services, rendered Kim PT completely ineligible for No-Fault reimbursement under New York law.

421.    Because Yom, D. Kim, Chun, S. Kim, and J. Kim caused Kim PT to bill Allstate for fraudulent and not compensable physical therapy services, Yom, D. Kim, Chun, S. Kim, and J. Kim purposely caused Kim PT to make a misrepresentation each and every time that Kim PT mailed (or was caused to mail) a document (i.e., invoice or statutory NF-3 claim form) to Allstate claiming eligibility for reimbursement.

422.    Moreover, because Yom, D. Kim, Chun, S. Kim, and J. Kim (a) purposely caused Kim PT to seek No-Fault reimbursement from Allstate (even though Kim PT was not lawfully entitled to such reimbursement), and (b) Kim PT used the U.S. Mail to seek reimbursement, it is clear that Yom, D. Kim, Chun, S. Kim, and J. Kim committed mail fraud.

423.    At all relevant times, Yom, D. Kim, Chun, S. Kim, and J. Kim knew that Kim PT, Kim PT's billing companies and/or agents, a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Kim PT.

424. Allstate estimates that the unlawful operation of the Kim PT enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed as Exhibit 11 and incorporated herein by reference as if set forth in its entirety.

C. **SYNERGYCARE PT**

425. In conducting the affairs of the Synergycare PT enterprise, Yom, D. Kim, Chun, S. Kim, and J. Kim either (a) personally used the U.S. Mail to further this scheme by causing patient records and bills/invoices from Synergycare PT to be mailed to Allstate and/or counsel for the claimants, or (b) acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of Synergycare PT's business.

426. At all relevant times, Yom, D. Kim, Chun, S. Kim, and J. Kim caused Synergycare PT to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that Synergycare PT mailed (or was caused to mail) a demand for payment (i.e., invoice or statutory NF-3 claim form) to Allstate.

427. Yom's, D. Kim's, Chun's, S. Kim's, and J. Kim's conduct of causing Synergycare PT to (a) share professional fees and profits with one or more non-licensed layperson, (b) participate in unlawful patient referral and/or financial arrangements with one or more of the Healthcare Provider Defendants and/or Entity Defendants, and (c) seek and collect No-Fault benefit payments in connection with excessive and clinically unnecessary physical therapy services, rendered Synergycare PT completely ineligible for No-Fault reimbursement under New York law.

428. Because Yom, D. Kim, Chun, S. Kim, and J. Kim caused Synergycare PT to bill Allstate for fraudulent and not compensable physical therapy services, Yom, D. Kim, Chun, S.

Kim, and J. Kim purposely caused Synergycare PT to make a misrepresentation each and every time that Synergycare PT mailed (or was caused to mail) a document (i.e., invoice or statutory NF-3 claim form) to Allstate claiming eligibility for reimbursement.

429. Moreover, because Yom, D. Kim, Chun, S. Kim, and J. Kim (a) purposely caused Synergycare PT to seek No-Fault reimbursement from Allstate (even though Synergycare PT was not lawfully entitled to such reimbursement), and (b) Synergycare PT used the U.S. Mail to seek reimbursement, it is clear that Yom, D. Kim, Chun, S. Kim, and J. Kim committed mail fraud.

430. At all relevant times, Yom, D. Kim, Chun, S. Kim, and J. Kim knew that Synergycare PT, Synergycare PT's billing companies and/or agents, a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Synergycare PT.

431. Allstate estimates that the unlawful operation of the Synergycare PT enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed as Exhibit 12 and incorporated herein by reference as if set forth in its entirety.

**D.** **JNR ACUPUNCTURE**

432. In conducting the affairs of the JNR Acupuncture enterprise, Yom, Chun, S. Kim, and J. Kim either (a) personally used the U.S. Mail to further this scheme by causing patient records and bills/invoices from JNA Acupuncture to be mailed to Allstate and/or counsel for the claimants, or (b) acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of JNA Acupuncture's business.

433. At all relevant times, Yom, Chun, S. Kim, and J. Kim caused JNR Acupuncture to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time JNR Acupuncture mailed (or was caused to mail) a demand for payment (i.e., invoice or statutory NF-3 claim form) to Allstate.

434. Yom's, Chun's, S. Kim's, and J. Kim's, conduct of causing JNR Acupuncture to (a) share professional fees and profits with one or more non-licensed layperson, (b) participate in unlawful patient referral and/or financial arrangements with one or more of the Healthcare Provider Defendants and/or Entity Defendants, and (c) seek and collect No-Fault benefit payments in connection with excessive and clinically unnecessary acupuncture services, rendered JNR Acupuncture completely ineligible for No-Fault reimbursement under New York law.

435. Because Yom, Chun, S. Kim, and J. Kim caused JNR Acupuncture to bill Allstate for fraudulent and not compensable acupuncture services, Yom, Chun, S. Kim, and J. Kim purposely caused JNR Acupuncture to make a misrepresentation each and every time that JNR Acupuncture mailed (or was caused to mail) a document (i.e., invoice or statutory NF-3 claim form) to Allstate claiming eligibility for reimbursement.

436. Moreover, because Yom, Chun, S. Kim, and J. Kim (a) purposely caused JNR Acupuncture to seek No-Fault reimbursement from Allstate (even though JNR Acupuncture was not lawfully entitled to such reimbursement), and (b) JNR Acupuncture used the U.S. Mail to seek reimbursement, it is clear that Yom, Chun, S. Kim, and J. Kim committed mail fraud.

437. At all relevant times, Yom, Chun, S. Kim, and J. Kim knew that JNR Acupuncture, JNR Acupuncture's billing companies and/or agents, a patient, a claimant, an insurance carrier, patient's attorney, other healthcare provider, or Allstate would use the U.S.

69

Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by JNR Acupuncture.

438.    Allstate estimates that the unlawful operation of the JNR Acupuncture enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed as Exhibit 13 and incorporated herein by reference as if set forth in its entirety.

## VII.    SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

### A.    FRAUDULENT CONCEALMENT — ORD ENTERPRISE

439.    The documents created and filed with the State of New York related to ORD omitted any reference to Yom's, Chun's, D. Kim's, J. Kim's, or S. Kim's (or 153 Plaza's) involvement with or control over Rosenblatt or ORD.

440.    The documents created and filed with the State of New York related to ORD gave no indication to Allstate or the general public that (a) non-physicians in any way maintained a controlling interest in ORD, (b) non-physicians participated in the operation and management of ORD, or (c) non-physicians shared in the professional fees and profits of ORD.

441.    Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of ORD, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Yom's, Chun's, D. Kim's, J. Kim's, and/or S. Kim's participation in the operation and management of ORD, including their sharing of ORD's professional fees and profits.

442.    Yom's, Chun's, D. Kim's, J. Kim's, and S. Kim's purposeful concealment of their participation in the operation and management of ORD allowed the scheme to continue undetected.

70

443.    At all relevant times during the operation of the ORD enterprise, to induce Allstate to promptly pay charges for healthcare services purportedly provided to patients who treated at ORD, Rosenblatt, Yom, Chun, D. Kim, J. Kim, and/or S. Kim caused ORD to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

444.    Yom participated in the conduct of ORD's affairs by routinely referring Flushing Clinic patients for treatment with Rosenblatt through ORD, treatment that was unwarranted and performed in a fraudulent manner.

445.    Rosenblatt participated in the conduct of ORD's affairs when he, among other things, signed (or was caused to sign) all documents necessary to incorporate ORD, and represented (or was caused to represent) in the bills and/or statutory NF-3 claim forms submitted to Allstate that the physician services purportedly performed through ORD were performed by employees of ORD, when in fact they were performed by an independent contractor.

446.    Rosenblatt also participated in the conduct of ORD's affairs when he attested (or when someone attested on his behalf) to the medical necessity of the services delivered to patients of ORD, including EDX testing and patient examinations, as well as to the validity of the charges for such services.

447.    Chun participated in the conduct of ORD's affairs when she submitted invoices through the U.S. Mail to No-Fault insurers, including Allstate, and by siphoning professional fees from ORD through a purported billing and collections service agreement.

448.    D. Kim participated in the conduct of ORD's affairs by acting as a sublessor on an agreement that permitted Rosenblatt and/or ORD to operate from the Flushing Clinic.

449.    J. Kim and S. Kim also participated in the conduct of ORD's affairs by siphoning professional fees from ORD through a purported facility lease agreement.

450.     At all relevant times, Rosenblatt, as a licensed physician, was legally and ethically obligated to act with honesty and integrity in connection with (a) the purported medical treatment rendered through ORD, and (b) the corresponding billing submitted to Allstate on behalf of ORD.

451.     At all relevant times, Yom, Rosenblatt, Chun, D. Kim, J. Kim, and S. Kim actively concealed from Allstate facts regarding the unlawful control of ORD, and Yom's, Chun's, D. Kim's, J. Kim's, and S. Kim's participation in the operation and management of ORD, to prevent Allstate from discovering that ORD was controlled by one or more non-physician, and therefore, was ineligible to bill for or collect No-Fault benefits.

452.     In fact, the Entity Defendants, including ORD, were caused to appear as separately owned, independent entities to prevent Allstate from detecting that these entities were part of an organized, pervasive insurance fraud scheme.

453.     The non-physicians further concealed their involvement in the operation and management of ORD by causing ORD to enter into leasing and billing/collection agreements with D. Kim and Chun, but then requiring Rosenblatt to make ORD's lease payments directly to 153 Plaza rather than D. Kim.

454.     Rosenblatt also undertook steps to prevent detection of (a) Yom's control over ORD, and (b) Yom's, Chun's, D. Kim's, J. Kim's, and S. Kim's participation in the operation and management of ORD.

455.     Specifically, when Rosenblatt provided sworn testimony to Allstate on behalf of ORD, Rosenblatt (a) denied that he had any relationship with Yom apart from sharing office space,  (b) feigned ignorance regarding whether the other Healthcare Provider Defendants and/or the Entity Defendants utilized Chun as their billing and collections agent, and (c) misrepresented

the hours that he was actually present at the Flushing Clinic—thereby preventing Allstate from fully discovering and exploring the role that Yom and Chun played in the operation and management of ORD.

456.    Further, following Rosenblatt's provision of sworn testimony to Allstate on behalf of ORD, Allstate issued document production requests to ORD's legal counsel seeking a series of documents, including written leases for the clinic locations from which Rosenblatt practiced.

457.    However, Rosenblatt failed to produce any lease agreements relating to the Flushing Clinic, despite providing sworn testimony confirming the existence of at least one written lease agreement.

458.    By failing to produce any lease agreements relating to the Flushing Clinic, Rosenblatt purposely prevented Allstate from discovering and investigating the role that J. Kim, S. Kim, and 153 Plaza played in the defendants' scheme to defraud.

459.    The facts and circumstances related to ORD's operation, management, and control are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

460.    Medical expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

461.    Thus, every time that Rosenblatt, Yom, Chun, D. Kim, J. Kim, and S. Kim caused ORD to submit No-Fault reimbursement demands to Allstate, these defendants (and those individuals working under their control) necessarily caused ORD to certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

462.     The full extent of Rosenblatt's, Yom's, Chun's, D. Kim's, J. Kim's, and/or S. Kim's (a) participation in the operation and management of the ORD enterprise, and (b) unlawful acts committed while conducting the affairs of the ORD enterprise was not, and could not have been, known to Allstate until it commenced this action.

### B.     FRAUDULENT CONCEALMENT – YOM AND YOM'S CHIRO

463.     Yom participated in this scheme by providing chiropractic and acupuncture services to patient of the Flushing Clinic through Yom's Chiro and JNR Acupuncture.

464.     The documents submitted to Allstate on behalf of Yom's Chiro regarding the reimbursement of No-Fault benefits gave no indication to Allstate that Yom created and utilized Yom's Chiro for the purpose of submitting charges to Allstate for excessive and clinically unnecessary chiropractic and acupuncture services.

465.     Based on the representations contained within the four corners of the documents submitted to Allstate on behalf of Yom's Chiro, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of the unlawful acts committed by Yom through Yom's Chiro.

466.     Yom's purposeful concealment of his unlawful acts committed through Yom's Chiro allowed Yom to continue to commit such unlawful acts through Yom's Chiro undetected.

467.     At all relevant times while acting through Yom's Chiro, to induce Allstate to promptly pay charges for healthcare services purportedly provided to patients who treated at the Flushing Clinic, Yom caused Yom's Chiro to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

468.     Yom purposely and knowingly engaged in unlawful conduct when he attested (or someone attested on his behalf) to the clinical necessity of the services delivered to patients of Yom's Chiro, as well as to the validity of the charges for such services.

469.     At all relevant times, Yom, as a licensed chiropractor and a licensed acupuncturist, was legally and ethically obligated to act with honesty and integrity in connection with (a) the purported chiropractic treatment rendered through Yom's Chiro, and (b) the corresponding billing submitted to Allstate on behalf of Yom's Chiro.

470.     At all relevant times, Yom actively concealed from Allstate facts regarding the clinical necessity of services purportedly provided to patients of Yom's Chiro, and his routine funneling of patients to other healthcare providers associated with the Flushing Clinic, including the other Healthcare Provider Defendants and/or Entity Defendants, for additional unnecessary services and referrals, to prevent Allstate from discovering that Yom, acting through Yom's Chiro, was ineligible to bill for or collect No-Fault benefits.

471.     In fact, Yom purposely organized a separate professional healthcare service entity under his own name (i.e., JNR Acupuncture) to purposely reduce the amount billed under a single entity, and to prevent Allstate from detecting the extent to which Yom was involved in the defendants' scheme to defraud.

472.     Yom further concealed his participation in the defendants' scheme to defraud by causing healthcare providers associated with the Flushing Clinic, including the other Healthcare Provider Defendants and/or the Entity Defendants, to enter into agreements with 153 Plaza and Chun, the terms of which permitted one or more non-licensed layperson to exert control of the operation, management, and finances of these healthcare providers.

473.    The facts and circumstances related to Yom's manner of operation are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

474.    Healthcare expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

475.    Thus, every time that Yom (along with those individuals working under his control, including Chun), acting through Yom's Chiro, submitted No-Fault reimbursement demands to Allstate, Yom (and those individuals working under his control, including Chun) necessarily certified that he was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

476.    The full extent of Yom's fraudulent and unlawful acts was not, and could not have been, known to Allstate until it commenced this action.

## C.     FRAUDULENT CONCEALMENT – KIM PT ENTERPRISE

477.     D. Kim participated in this scheme by providing physical therapy services to patients of the Flushing Clinic through Kim PT.

478.     The documents created and filed with the State of New York related to Kim PT deliberately omitted any reference to Yom's, Chun's, J. Kim's, or S. Kim's involvement with Kim PT.

479.     The documents created and filed with the State of New York related to Kim PT gave no indication to Allstate or the general public that (a) D. Kim incorporated Kim PT for the purpose of submitting charges to Allstate for excessive and unnecessary physical therapy services, or (b) Yom, Chun, J. Kim, and S. Kim shared in the professional fees and profits of Kim PT through certain lease and service agreements structured between Kim PT and 153 Plaza, and between Kim PT and Chun, which were designed to disguise an improper patient referral arrangement.

480.     Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Kim PT, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of the unlawful acts committed by D. Kim, Yom, Chun, J. Kim, and S. Kim through Kim PT.

481.     The purposeful concealment of Yom's, Chun's, J. Kim's, and S. Kim's unlawful involvement in the operation and management of Kim PT, including the existence of the treatment protocol established by Yom for Kim PT, and Yom's, Chun's, J. Kim's, and S. Kim's unlawful channeling of Kim PT's professional physical therapy fees and profits, allowed D. Kim, Yom, Chun, J. Kim, and S. Kim to continue to commit such unlawful acts through Kim PT undetected.

482.    At all relevant times during the operation of the Kim PT enterprise, to induce Allstate to promptly pay charges for healthcare services purportedly provided to patients who treated at Kim PT, D. Kim and Yom caused Kim PT to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

483.    D. Kim participated in the conduct of Kim PT's affairs when he attested (or when someone attested on his behalf) to the clinical necessity of the services delivered to patients of Kim PT, as well as to the validity of the charges for such services.

484.    Yom participated in the conduct of Kim PT's affairs by causing D. Kim, on behalf of Kim PT, to compensate Yom in exchange for patient referrals for treatment from ORD, regardless of clinical necessity—constituting an unlawful professional fee split—and by setting the treatment protocol utilized by Kim PT.

485.    Chun participated in the conduct of Kim PT's affairs when she submitted invoices through the U.S. Mail to No-Fault insurers, including Allstate, and by siphoning professional fees from Kim PT through a purported billing and collections service agreement.

486.    J. Kim and S. Kim, acting through 153 Plaza, also participated in the conduct of Kim PT's affairs by siphoning professional fees from Kim PT through a purported facility lease agreement.

487.    At all relevant times, D. Kim, as a licensed physical therapist, was legally and ethically obligated to act with honesty and integrity in connection with (a) the purported physical therapy treatment rendered through Kim PT, and (b) the corresponding billing submitted to Allstate on behalf of Kim PT.

488.    At all relevant times, Yom, Chun, J. Kim, and S. Kim actively concealed from Allstate facts regarding their receipt of Kim PT's professional fees and the clinical necessity of

services purportedly provided to patients of Kim PT, to prevent Allstate from discovering that Kim PT was ineligible to bill for or collect No-Fault benefits.

489.    Further, Yom caused D. Kim to disguise the referral payments made by Kim PT as "rental" payments to 153 Plaza and as "billing" and "collections" fees paid to Chun in order to prevent detection of Yom's, Chun's, J. Kim's, and S. Kim's siphoning of Kim PT's professional fees.

490.    Additionally, Yom purposely caused numerous physical therapy entities to operate from the same facility space as Kim PT, which he represented to be separately owned, independent entities, to prevent Allstate from detecting that these entities were part of an organized, pervasive insurance fraud scheme masterminded by Yom.

491.    In fact, Yom caused D. Kim to incorporate and operate other professional service entities from the Flushing Clinic in order to reduce the amount billed under a single entity and prevent detection of the scheme.

492.    The facts and circumstances related to Kim PT's manner of operation are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

493.    Healthcare expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

494.    Thus, every time that D. Kim, Yom, Chun, J. Kim, and S. Kim caused Kim PT to submit No-Fault reimbursement demands to Allstate, these defendants (and those individuals

working under their control, including Chun) necessarily certified that Kim PT was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

495.    The full extent of D. Kim's, Yom's, Chun's, J. Kim's, and S. Kim's (a) participation in the operation and management of the Kim PT enterprise, and (b) unlawful acts committed while conducting the affairs of the Kim PT enterprise was not, and could not have been, known to Allstate until it commenced this action.

**D.      FRAUDULENT CONCEALMENT – SYNERGYCARE PT ENTERPRISE**

496.    D. Kim participated in this scheme by providing physical therapy services to patients of the Flushing Clinic through Synergycare PT.

497.    The documents created and filed with the State of New York related to Synergycare PT deliberately omitted any reference to Yom's, Chun's, J. Kim's, or S. Kim's involvement with Synergycare PT.

498.    The documents created and filed with the State of New York related to Synergycare PT gave no indication to Allstate or the general public that (a) D. Kim incorporated Synergycare PT for the purpose of submitting charges to Allstate for excessive and unnecessary physical therapy services, or (b) Yom, Chun, J. Kim, and S. Kim shared in the professional fees and profits of Synergycare PT through certain lease and service agreements structured between Synergycare PT and 153 Plaza, and between Synergycare PT and Chun, which were designed to disguise an improper patient referral arrangement.

499.    Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of Synergycare PT, Allstate—even acting with reasonable diligence—could not possibly have discovered the nature and extent of the unlawful acts committed by D. Kim, Yom, Chun, J. Kim, and S. Kim through Synergycare PT.

500.     The purposeful concealment of Yom's, Chun's, J. Kim's, and S. Kim's unlawful involvement in the operation and management of Synergycare PT, including the existence of the treatment protocol established by Yom for Synergycare PT, and Yom's, Chun's, J. Kim's, and S. Kim's unlawful channeling of Synergycare PT's professional physical therapy fees and profits, allowed D. Kim, Yom, Chun, J. Kim, and S. Kim to continue to commit such unlawful acts through Synergycare PT undetected.

501.     At all relevant times during the operation of the Synergycare PT enterprise, to induce Allstate to promptly pay charges for healthcare services purportedly provided to patients who treated at Synergycare PT, D. Kim, Yom, Chun, J. Kim, and S. Kim caused Synergycare PT to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

502.     D. Kim participated in the conduct of Synergycare PT's affairs when he attested (or when someone attested on his behalf) to the clinical necessity of the services delivered to patients of Synergycare PT, as well as to the validity of the charges for such services.

503.     Yom participated in the conduct of Synergycare PT's affairs by causing D. Kim, on behalf of Synergycare PT, to compensate Yom in exchange for patient referrals for treatment from ORD, regardless of clinical necessity—constituting an unlawful professional fee split—and by setting the treatment protocol utilized by Synergycare PT.

504.     Chun participated in the conduct of Synergycare PT's affairs when she submitted invoices through the U.S. Mail to No-Fault insurers, including Allstate, and by siphoning professional fees from Synergycare PT through a purported billing and collections service agreement.

505.     J. Kim and S. Kim also participated in the conduct of Synergycare PT's affairs by siphoning professional fees from Synergycare PT through a purported facility lease agreement.

506.     At all relevant times, D. Kim, as a licensed physical therapist, was legally and ethically obligated to act with honesty and integrity in connection with (a) the purported physical therapy treatment rendered through Synergycare PT, and (b) the corresponding billing submitted to Allstate on behalf of Synergycare PT.

507.     At all relevant times, Yom, Chun, J. Kim, and S. Kim actively concealed from Allstate facts regarding their receipt of Synergycare PT's professional fees and the clinical necessity of services purportedly provided to patients of Synergycare PT, to prevent Allstate from discovering that Synergycare PT was ineligible to bill for or collect No-Fault benefits.

508.     Further, Yom caused D. Kim to disguise the referral payments made by Synergycare PT as "rental" payments to 153 Plaza and as "billing" and "collections" fees paid to Chun in order to prevent detection of Yom's, Chun's, J. Kim's, and S. Kim's siphoning of Synergycare PT's professional fees.

509.     Additionally, Yom purposely caused numerous physical therapy entities to operate from the same facility space as Synergycare PT, which he represented to be separately owned, independent entities, to prevent Allstate from detecting that these entities were part of an organized, pervasive insurance fraud scheme masterminded by Yom.

510.     In fact, Yom caused D. Kim to incorporate and operate other professional service entities from the Flushing Clinic in order to reduce the amount billed under a single entity and prevent detection of the scheme.

511.     The facts and circumstances related to Synergycare PT's manner of operation are not readily evident within the four corners of the documents submitted to Allstate by these

defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

512.    Healthcare expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

513.    Thus, every time that D. Kim, Yom, Chun, J. Kim, and S. Kim (along with those individuals working under their control) caused Synergycare PT to submit No-Fault reimbursement demands to Allstate, these defendants (and those individuals working under their control) necessarily certified that Synergycare PT was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

514.    The full extent of D. Kim's, Yom's, Chun's, J. Kim's, and S. Kim's (a) participation in the operation and management of the Synergycare PT enterprise, and (b) unlawful acts committed while conducting the affairs of the Synergycare PT enterprise was not, and could not have been, known to Allstate until it commenced this action.

E.    FRAUDULENT CONCEALMENT — JNR ACUPUNCTURE ENTERPRISE

515.    Yom participated in this scheme by providing acupuncture services to patients of the Flushing Clinic through JNR Acupuncture.

516.    The documents created and filed with the State of New York related to JNR Acupuncture gave no indication to Allstate or the general public that Yom incorporated JNR Acupuncture to submit charges to Allstate for excessive and clinically unnecessary acupuncture services.

517.    Based on the representations contained within the four corners of the documents filed with the State of New York on behalf of JNR Acupuncture, Allstate—even acting with

reasonable diligence—could not possibly have discovered the nature and extent of the unlawful acts committed by Yom through JNR Acupuncture.

518.     Yom's purposeful concealment of his unlawful acts committed through JNR Acupuncture allowed Yom to continue to commit such unlawful acts through JNR Acupuncture undetected.

519.     At all relevant times during the operation of the JNR Acupuncture enterprise, to induce Allstate to promptly pay charges for healthcare services purportedly provided to patients who treated at JNR Acupuncture, Yom caused JNR Acupuncture to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

520.     Yom participated in the conduct of JNR Acupuncture's affairs when he attested (or someone attested on his behalf) to the clinical necessity of the services delivered to patients of JNR Acupuncture, as well as to the validity of the charges for such services.

521.     At all relevant times, Yom, as a licensed acupuncturist, was legally and ethically obligated to act with honesty and integrity in connection with (a) the purported acupuncture treatment rendered through JNR Acupuncture, and (b) the corresponding billing submitted to Allstate on behalf of JNR Acupuncture.

522.     At all relevant times, Yom actively concealed from Allstate facts regarding the clinical necessity of services purportedly provided to patients of JNR Acupuncture to prevent Allstate from discovering that JNR Acupuncture was ineligible to bill for or collect No-Fault benefits.

523.     In fact, Yom purposely operated under the fictitious business "Yom's Chiro" in order to reduce the amount billed under a single entity, and to prevent Allstate from detecting

that the PC Defendants were part of an organized, pervasive insurance fraud scheme masterminded by Yom.

524.     Yom further concealed his participation in the defendants' scheme to defraud by causing healthcare providers associated with the Flushing Clinic, including the other Healthcare Provider Defendants and/or the Entity Defendants, to enter into agreements with D. Kim, 153 Plaza and Chun, the terms of which permitted one or more non-licensed layperson to exert control of the operation, management, and finances of these healthcare providers.

525.     The facts and circumstances related to JNR Acupuncture's manner of operation are not readily evident within the four corners of the documents submitted to Allstate by these defendants and upon which Allstate relied in adjusting the claims and in tendering payment in connection with each discrete patient claim at issue in this matter.

526.     Healthcare expense claims under New York's No-Fault laws can only be submitted, and reimbursed, for services provided in accord with all applicable New York State and local licensing requirements.

527.     Thus, every time that Yom (along with those individuals working under his control) caused JNR Acupuncture to submit No-Fault reimbursement demands to Allstate, Yom (and those individuals working under his control) necessarily certified that JNR Acupuncture was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

528.     The full extent of Yom's unlawful acts committed while conducting the affairs of the JNR Acupuncture enterprise—including JNR Acupuncture's routine submission of bills to Allstate for acupuncture services that are excessive, clinically unnecessary, and rendered pursuant to a predetermined treatment protocol established by Yom—was not, and could not have been, known to Allstate until it commenced this action.

## VIII.  ALLSTATE'S JUSTIFIABLE RELIANCE

529.  Each claim submitted to Allstate by (or on behalf of) Rosenblatt, ORD, Yom (doing business as Yom's Chiro), Kim PT, Synergycare PT, and JNR Acupuncture was verified pursuant to Insurance Law § 403.

530.  At all relevant times, Yom, Rosenblatt, and D. Kim, as licensed healthcare providers, were legally and ethically obligated to act with honesty and integrity in connection with their provision of, and billing for, healthcare services.

531.  To induce Allstate to promptly pay Rosenblatt's, ORD's, Yom/Yom's Chiro's, Kim PT's, Synergycare PT's, and JNR Acupuncture's patient invoices, the defendants submitted (or caused to be submitted) to Allstate NF-3 forms or HCFA forms certifying that ORD, Yom/Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture were eligible to be reimbursed under New York's No-Fault laws.

532.  Further, to induce Allstate to promptly pay the non-compensable charges for the medical, chiropractic, physical therapy, and acupuncture services purportedly provided to patients of Rosenblatt, ORD, Yom/Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture, the defendants hired attorneys and law firms to pursue collection of the fraudulent and/or otherwise not compensable charges from Allstate.  These attorneys and law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate in the event that Rosenblatt's, ORD's, Yom/Yom's Chiro, Kim PT's, Synergycare PT's, and JNR Acupuncture's charges are not promptly paid in full.

533.  Allstate is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days.  The facially valid documents submitted to Allstate in

support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

534.    At all relevant times, as alleged above, the defendants concealed from Allstate the truth regarding Rosenblatt's, ORD's, Yom's/Yom's Chiro's, Kim PT's, Synergycare PT's, and JNR Acupuncture's reimbursement eligibility under New York law.

535.    In reasonable reliance on these misrepresentations, Allstate paid money to Rosenblatt, ORD, Yom/Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture to its detriment.

536.    Allstate would not have made any of these payments to these entities had the defendants provided true and accurate information about Rosenblatt's, ORD's, Yom/Yom's Chiro, Kim PT's, Synergycare PT's, and JNR Acupuncture's reimbursement eligibility under New York law, including the operation of the entities and the fact and necessity of the services provided.

537.    As a result of the defendants' conduct, Allstate has paid in excess of $3,162,360.97 in reasonable reliance on the defendants' false healthcare documentation and false representations regarding the defendants' eligibility for reimbursement under New York's No-Fault laws.

538.    Because the defendants actively concealed their fraudulent conduct from Allstate, Allstate did not discover, and could not have reasonably discovered, that it had been damaged by the defendants' fraudulent conduct until shortly before it filed this Complaint.

## IX.    DAMAGES

539.    The defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law.    Although it is not

necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for:

(a) Payments made to ORD Physiatry, P.C. in connection with first-party ("No-Fault") claims in excess of $107,085.23, the exact amount to be determined at trial. The chart annexed as Exhibit 14, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to ORD Physiatry, P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(b) Payments made to Marc Rosenblatt, D.O. in connection with first-party ("No-Fault") claims in excess of $369,078.03, the exact amount to be determined at trial. The chart annexed as Exhibit 15 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Marc Rosenblatt, D.O. in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(c) Payments made to Yom, doing business as Yom's Chiro, in connection with first-party ("No-Fault") claims in excess of $1,281,963.46, the exact amount to be determined at trial. The chart annexed as Exhibit 16 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Yom, doing business as Yom's Chiro, in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(d) Payments made to Dohyung Kim Physical Therapy, P.C. in connection with first-party ("No-Fault") claims in excess of $1,050,682.79, the exact amount to be determined at trial. The chart annexed as Exhibit 17 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Dohyung Kim Physical Therapy, P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(e) Payments made to Synergycare Physical Therapy, P.C. in connection with first-party ("No-Fault") claims in excess of $129,761.05, the exact amount to be determined at trial. The chart annexed as Exhibit 18 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Synergycare Physical Therapy, P.C. in connection with first-party ("No-Fault") claims determined to be fraudulent and not compensable as of the filing of this Complaint.

(f) Payments made to JNR Acupuncture, P.C. in connection with first-party ("No-Fault") claims in excess of $223,790.41, the exact amount to be determined at trial. The chart annexed as Exhibit 19 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to JNR Acupuncture, P.C. in connection with first-party ("No-Fault")

claims determined to be fraudulent and not compensable as of the filing of this Complaint.

## X.    CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ORD PHYSIATRY, P.C. ENTERPRISE
**(Against Marc J. Rosenblatt, D.O., 153 Plaza LLC, Dohyung Kim, P.T., Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

540.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if set forth fully herein.

541.    In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of ORD Physiatry, P.C., Defendants Marc J. Rosenblatt, D.O., Jong Won Yom, D.C., L.Ac., Dohyung Kim, P.T., Seungho Kim, Jeewha Kim, Michelle Chun, and 153 Plaza LLC (collectively, the "Count I Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of ORD Physiatry, P.C.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by ORD Physiatry, P.C. would occur, in furtherance of the Count I Defendants' scheme to defraud.

542.    The Count I Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 10.

543.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

544.    Policies of insurance were delivered to insureds through the U.S Mail.

545. Payments made by Allstate to ORD Physiatry, P.C. were delivered through the U.S. Mail.

546. As described above, the Count I Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other claim-related documentation to Allstate related to medical services purportedly provided to patients of ORD Physiatry, P.C. for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

547. As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to ORD Physiatry, P.C., for the benefit of one or more of the Count I Defendants, that would not otherwise have been paid.

548. The Count I Defendants' pattern of preparing and mailing (or causing or knowing of the mailing of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

549. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

550. By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

551.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to ORD Physiatry, P.C. for the benefit of the Count I Defendants.

552.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

553.    ORD Physiatry, P.C. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

554.    The Count I Defendants associated with the ORD Physiatry, P.C., and participated—both directly and indirectly—in the conduct of the ORD Physiatry, P.C. enterprise through a pattern of racketeering activities.

555.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

556.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

557.    By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ORD PHYSIATRY, P.C. ENTERPRISE**
**(Against Marc J. Rosenblatt, D.O., 153 Plaza LLC, Dohyung Kim, P.T., Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

558.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth fully herein.

559.    Through their participation in the operation and management of ORD Physiatry, P.C., Defendants Marc J. Rosenblatt, D.O., Jong Won Yom, D.C., L.Ac., Dohyung Kim, P.T., Seungho Kim, Jeewha Kim, Michelle Chun, and 153 Plaza LLC (collectively, the "Count II Defendants"), conspired with each other to violate 18 U.S.C. § 1962(c).

560.    The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of ORD Physiatry, P.C. by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 10, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

561.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of ORD Physiatry, P.C., even though ORD Physiatry, P.C., as a result of the Count II Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

562.    The Count II Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

563.    The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate on behalf of ORD Physiatry, P.C. in connection with medical treatment that was excessive, not medically necessary, and, in certain instances, improperly billed.

564.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

565.     By virtue of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**DOHYUNG KIM PHYSICAL THERAPY, P.C. ENTERPRISE**
**(Against Dohyung Kim, P.T., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

566.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if set forth fully herein.

567.     In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of Dohyung Kim Physical Therapy, P.C., Defendants Dohyung Kim, P.T., Jong Won Yom, D.C., L.Ac., Seungho Kim, Jeewha Kim, Michelle Chun, and 153 Plaza LLC (collectively, the "Count III Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Dohyung Kim Physical Therapy, P.C.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by Dohyung Kim Physical Therapy, P.C. would occur, in furtherance of the Count III Defendants' scheme to defraud.

568.     The Count III Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 11.

569. Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

570. Policies of insurance were delivered to insureds through the U.S Mail.

571. Payments made by Allstate to Dohyung Kim Physical Therapy, P.C. were delivered through the U.S. Mail.

572. As described above, the Count III Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other claim-related documentation to Allstate related to physical therapy services purportedly provided to patients of Dohyung Kim Physical Therapy, P.C. for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

573. As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Dohyung Kim Physical Therapy, P.C., for the benefit of one or more of the Count III Defendants, that would not otherwise have been paid.

574. The Count III Defendants' pattern of preparing and mailing (or causing or knowing of the mailing of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

575. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

576.    By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

577.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Dohyung Kim Physical Therapy, P.C. for the benefit of the Count III Defendants.

578.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

579.    Dohyung Kim Physical Therapy, P.C. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

580.    The Count III Defendants associated with the Dohyung Kim Physical Therapy, P.C., and participated—both directly and indirectly—in the conduct of the Dohyung Kim Physical Therapy, P.C. enterprise through a pattern of racketeering activities.

581.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

582.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

583.    By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims

submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**DOHYUNG KIM PHYSICAL THERAPY, P.C. ENTERPRISE**
**(Against Dohyung Kim, P.T., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

584.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth fully herein.

585.    Through their participation in the operation and management of Dohyung Kim Physical Therapy, P.C., Defendants Dohyung Kim, P.T., Jong Won Yom, D.C., L.Ac., Seungho Kim, Jeewha Kim, Michelle Chun, and 153 Plaza LLC (collectively, the "Count IV Defendants"), conspired with each other to violate 18 U.S.C. § 1962(c).

586.    The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Dohyung Kim Physical Therapy, P.C. by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 11, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

587.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Dohyung Kim Physical Therapy, P.C., even though Dohyung Kim Physical Therapy, P.C., as a result of the Count IV Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

588.     The Count IV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

589.     The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate on behalf of Dohyung Kim Physical Therapy, P.C. in connection with physical therapy treatment that was excessive, not clinically necessary, provided pursuant to a predetermined treatment protocol, and the result of one or more improper patient referral arrangement.

590.     Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

591.     By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### SYNERGYCARE PHYSICAL THERAPY, P.C. ENTERPRISE
**(Against Dohyung Kim, P.T., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

592.     Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if set forth fully herein.

593.     In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of Synergycare Physical Therapy, P.C., Defendants Dohyung Kim,

P.T., Jong Won Yom, D.C., L.Ac., Seungho Kim, Jeewha Kim, Michelle Chun, and 153 Plaza LLC (collectively, the "Count V Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of Synergycare Physical Therapy, P.C.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by Synergycare Physical Therapy, P.C. would occur, in furtherance of the Count V Defendants' scheme to defraud.

594.    The Count V Defendants employed (or knew or should have known of) two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 12.

595.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

596.    Policies of insurance were delivered to insureds through the U.S Mail.

597.    Payments made by Allstate to Synergycare Physical Therapy, P.C. were delivered through the U.S. Mail.

598.    As described above, the Count V Defendants repeatedly and intentionally submitted (or knew or should have known of the submission of) NF-3 forms and other claim-related documentation to Allstate related to physical therapy services purportedly provided to patients of Synergycare Physical Therapy, P.C. for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

599.    As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Synergycare Physical Therapy, P.C., for the benefit of one or more of the Count V Defendants, that would not otherwise have been paid.

600.    The Count V Defendants' pattern of preparing and mailing (or causing or knowing of the mailing of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

601.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

602.    By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

603.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Synergycare Physical Therapy, P.C. for the benefit of the Count V Defendants.

604.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

605.    Synergycare Physical Therapy, P.C. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

606.     The Count V Defendants associated with the Synergycare Physical Therapy, P.C., and participated—both directly and indirectly—in the conduct of the Synergycare Physical Therapy, P.C. enterprise through a pattern of racketeering activities.

607.     Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' conduct.

608.     The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

609.     By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### SYNERGYCARE PHYSICAL THERAPY, P.C. ENTERPRISE
**(Against Dohyung Kim, P.T., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

610.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth fully herein.

611.     Through their participation in the operation and management of Synergycare Physical Therapy, P.C., Defendants Dohyung Kim, P.T., Jong Won Yom, D.C., L.Ac., Seungho Kim, Jeewha Kim, Michelle Chun, and 153 Plaza LLC (collectively, the "Count VI Defendants"), conspired with each other to violate 18 U.S.C. § 1962(c).

612.     The Count VI Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Synergycare Physical Therapy, P.C. by

means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 12, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

613.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Synergycare Physical Therapy, P.C., even though Synergycare Physical Therapy, P.C., as a result of the Count VI Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

614.    The Count VI Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

615.    The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate on behalf of Synergycare Physical Therapy, P.C. in connection with physical therapy treatment that was excessive, not clinically necessary, provided pursuant to a predetermined treatment protocol, and the result of one or more improper patient referral arrangement.

616.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

617.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### JNR ACUPUNCTURE, P.C. ENTERPRISE
### (Against Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun)

618. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if set forth fully herein.

619. In connection with claims submitted to Allstate demanding reimbursement for services provided to patients of JNR Acupuncture, P.C., Defendants Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun (collectively, the "Count VII Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims, or knew that such false medical documentation would be mailed in the ordinary course of JNR Acupuncture, P.C.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by JNR Acupuncture, P.C. would occur, in furtherance of the Count VII Defendants' scheme to defraud.

620. The Count VII Defendants employed two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 13.

621. Among other things, NF-3 forms, healthcare billing invoices, healthcare reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

622. Policies of insurance were delivered to insureds through the U.S Mail.

623. Payments made by Allstate to JNR Acupuncture, P.C. were delivered through the U.S. Mail.

624. As described above, the Count VII Defendants repeatedly and intentionally submitted (or caused the submission of) NF-3 forms and other claim-related documentation to Allstate related to acupuncture services purportedly provided to patients of JNR Acupuncture, P.C. for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

625. As a result of, and in reasonable reliance upon, these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to JNR Acupuncture, P.C., for the benefit of one or more of the Count VII Defendants, which would not otherwise have been paid.

626. The Count VII Defendants' pattern of preparing and mailing (or causing the mailing of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue this scheme without being detected.

627. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

628. By creating and then mailing (or agreeing to mail) to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent claims in an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

629. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to JNR Acupuncture, P.C. for the benefit of the Count VII Defendants.

105

630.     Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

631.     JNR Acupuncture, P.C. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

632.     The Count VII Defendants associated with the JNR Acupuncture, P.C. enterprise, and participated in the conduct of the JNR Acupuncture, P.C. enterprise through a pattern of racketeering activities.

633.     Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII Defendants' conduct.

634.     The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

635.     By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT VIII

**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**JNR ACUPUNCTURE, P.C. ENTERPRISE**
**(Against Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun)**

636.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth fully herein.

106

637. Through their participation in the operation and management of JNR Acupuncture, P.C., Defendants Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun (collectively, the "Count VIII Defendants"), conspired with each other to violate 18 U.S.C. § 1962(c).

638. The Count VIII Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of JNR Acupuncture, P.C. by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 13, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

639. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of JNR Acupuncture, P.C., even though JNR Acupuncture, P.C., as a result of the Count VIII Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

640. The Count VIII Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

641. The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate on behalf of JNR Acupuncture, P.C. in connection with acupuncture therapy treatment that was excessive, not clinically necessary, provided pursuant to a predetermined treatment protocol, and the result of one or more improper patient referral arrangement.

642. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

643. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### 153 PLAZA LLC ENTERPRISE
**(Against Seungho Kim, Jeewha Kim, Michelle Chun, Marc J. Rosenblatt, D.O., Jong Won Yom, D.C., L.Ac., Dohyung Kim, P.T., ORD Physiatry, P.C., Dr. Yom's Chiropractic and Alternative Care, Dohyung Kim Physical Therapy, P.C., Synergycare Physical Therapy, P.C., and JNR Acupuncture, P.C.)**

644. Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if set forth fully herein.

645. In furtherance of their operation and management of 153 Plaza LLC, Defendants Seungho Kim, Jeewha Kim, Michelle Chun, Marc J. Rosenblatt, D.O., Jong Won Yom, D.C., L.Ac. (individually and doing business as Dr. Yom's Chiropractic and Alternative Care), Dohyung Kim, P.T., ORD Physiatry, P.C., Dohyung Kim Physical Therapy, P.C., Synergycare Physical Therapy, P.C., and JNR Acupuncture, P.C. (collectively, the "Count IX Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

646. The Count IX Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the charts at Exhibits 10-13.

108

647.     Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

648.     Policies of insurance were delivered to insurers through the U.S. Mail.

649.     Payments made by Allstate to ORD Physiatry, P.C. ("ORD"), Dr. Yom's Chiropractic & Alternative Care ("Yom's Chiro"), Dohyung Kim Physical Therapy, P.C. ("Kim PT"), Synergycare Physical Therapy, P.C. ("Synergycare PT"), and JNR Acupuncture, P.C. ("JNR Acupuncture")—the proceeds of which were, in part, diverted to 153 Plaza LLC for the benefit of Seungho Kim and Jeewha Kim—were delivered through the U.S. Mail.

650.     Upon information and belief, two or more payments made by ORD, Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture to 153 Plaza LLC—which were ultimately for the personal benefit of Seungho Kim and Jeewha Kim—were delivered through the U.S. Mail.

651.     During the relevant period, the Count IX Defendants repeatedly and intentionally submitted (or caused the submission of) NF-3 forms and other medical documentation to Allstate for healthcare expenses and/or services that were purportedly performed at ORD, Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

652.     The use of 153 Plaza LLC to siphon the professional healthcare fees and profits from ORD, Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture to 153 Plaza LLC, and then to effectuate the transfer of these ill-gotten proceeds from 153 Plaza LLC to Seungho Kim and Jeewha Kim for their own personal use and financial gain, was unlawful.

653. The use of 153 Plaza LLC's agreements with and relationship to ORD, Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture allowed Seungho Kim and Jeewha Kim to exercise control over the operation and management of ORD, Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture, and further permitted Seungho Kim and Jeewha Kim to share in the professional fees and profits collected by ORD, Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture.

654. Overall, ORD's, Yom's Chiro's, Kim PT's, Synergycare PT's and JNR Acupuncture's relationship with 153 Plaza LLC facilitated Seungho Kim's and Jeewha Kim's unlawful control over ORD, Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture, and further rendered ORD, Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture lawfully ineligible to seek or collect No-Fault payments.

655. When the Count IX Defendants mailed (or caused the mailing of) NF-3 forms and other claim-related documents to Allstate seeking No-Fault reimbursement, the Count IX Defendants materially misrepresented ORD's, Yom's Chiro's, Kim PT's, Synergycare PT's and JNR Acupuncture's No-Fault reimbursement eligibility under New York law.

656. As a result of, and in reasonable reliance upon, the mailing and/or submission of these misleading documents and materially false misrepresentations, Allstate, by its agents and employees, issued drafts to ORD, Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture, for the benefit of one or more of the Count IX Defendants that would not otherwise have been paid.

657. The Count IX Defendants' pattern of submitting (or causing the submission of) fraudulent claims, each appearing legitimate on their face, also prevented Allstate from

110

discovering this scheme for a long period of time, thus enabling them to continue without being detected.

658. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

659. By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate of) numerous fraudulent documents and other claim-related material in an ongoing scheme, the Count IX Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

660. The activities alleged in this case had the direct effect of causing professional healthcare fees and profits to be transferred from Allstate to ORD, Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture for the benefit of one or more of the Count IX Defendants.

661. The unlawful activities alleged in this case also had the direct effect of causing the professional fees and profits of ORD, Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture to be channeled to 153 Plaza LLC, and then from 153 Plaza LLC to Seungho Kim and Jeewha Kim for their own personal use and unlawful financial gain.

662. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

663. 153 Plaza LLC constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

664.    The Count IX Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

665.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX Defendants' conduct.

666.    The Count IX Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

667.    By virtue of the Count IX Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### 153 PLAZA LLC ENTERPRISE
**(Against Seungho Kim, Jeewha Kim, Michelle Chun, Marc J. Rosenblatt, D.O., Jong Won Yom, D.C., L.Ac., Dohyung Kim, P.T., ORD Physiatry, P.C., Dr. Yom's Chiropractic and Alternative Care, Dohyung Kim Physical Therapy, P.C., Synergycare Physical Therapy, P.C., and JNR Acupuncture, P.C.)**

668.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if set forth fully herein.

669.    Throughout their participation in the operation and management of 153 Plaza LLC, Defendants Seungho Kim, Jeewha Kim, Michelle Chun, Marc J. Rosenblatt, D.O., Jong Won Yom, D.C., L.Ac. (individually and doing business as Dr. Yom's Chiropractic and Alternative Care), Dohyung Kim, P.T., ORD Physiatry, P.C., Dohyung Kim Physical Therapy,

P.C., Synergycare Physical Therapy, P.C., and JNR Acupuncture, P.C. (collectively, the "Count X Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

670.    The Count X Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of 153 Plaza LLC by means of a pattern of racketeering activity through ORD Physiatry, P.C. ("ORD"), Dr. Yom's Chiropractic & Alternative Care ("Yom's Chiro"), Dohyung Kim Physical Therapy, P.C. ("Kim PT"), Synergycare Physical Therapy, P.C. ("Synergycare PT"), and JNR Acupuncture, P.C. ("JNR Acupuncture"), including numerous instances of mail fraud as set forth in Exhibits 10-13, and through the preparation and mailing of fraudulent documents and other claim-related documents, including NF-3 forms, to Allstate.

671.    The purpose of the conspiracy was to obtain, for 153 Plaza LLC's benefit, No-Fault payments from Allstate on behalf of ORD, Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture, even though ORD, Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture, as a result of defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

672.    The purpose of the conspiracy was also to cause professional healthcare fees and profits collected by ORD, Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture to be channeled to 153 Plaza LLC for the benefit of Seungho Kim and Jeewha Kim.

673.    The Count X Defendants' use of 153 Plaza LLC to funnel professional healthcare fees and profits from ORD, Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture to Seungho Kim and Jeewha Kim was unlawful, and allowed Seungho Kim and Jeewha Kim to exercise control over the operation and management of ORD, Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture, and further permitted Seungho Kim and Jeewha Kim to

share in the professional healthcare fees and profits collected by ORD, Yom's Chiro, Kim PT, Synergycare PT, and JNR Acupuncture.

674. The Count X Defendants were aware of these purposes, and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents and other claim-related materials, including NF-3 forms, containing material misrepresentations and/or material omissions.

675. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count X Defendants' unlawful conduct described herein.

676. By virtue of this violation of 18 U.S.C. § 1962(d), the Count X Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Count X Defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XI
## COMMON LAW FRAUD
**(Against ORD Physiatry, P.C., Marc J. Rosenblatt, D.O., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

677. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

678. Defendants ORD Physiatry, P.C., Marc J. Rosenblatt, D.O., Jong Won Yom, D.C., L.Ac., Seungho Kim, Jeewha Kim, Michelle Chun, and 153 Plaza LLC (collectively, "Count XI Defendants") conspired to defraud Allstate through their unlawful management and control of ORD Physiatry, P.C.

114

679.    The defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that ORD Physiatry, P.C. was entitled to receive No-Fault reimbursement under New York law.

680.    The misrepresentations of fact by the defendants included, but were not limited to, the material misrepresentations of fact made in defendants' reports, invoices, and collection documentation.

681.    The defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

682.    The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate by submitting claims from ORD Physiatry, P.C.—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

683.    The defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

684.    Allstate reasonably relied, to its detriment, upon the defendants' material misrepresentations concerning ORD Physiatry, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

685.    Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to ORD Physiatry, P.C.—in excess of $107,085.23—for medical expenses and services rendered to Allstate claimants, even though ORD Physiatry, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XII
## COMMON LAW FRAUD
### (Against Marc J. Rosenblatt, D.O., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)

686.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

687.     Defendants Marc J. Rosenblatt, D.O., Jong Won Yom, D.C., L.Ac., Seungho Kim, Jeewha Kim, Michelle Chun, and 153 Plaza LLC (collectively, "Count XII Defendants") conspired to defraud Allstate through their unlawful sharing in the professional physician fees of Marc J. Rosenblatt, D.O.'s Flushing Clinic practice.

688.     The defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Marc J. Rosenblatt, D.O., practicing under his own name from his Flushing Clinic practice, was entitled to receive No-Fault reimbursement under New York law.

689.     The misrepresentations of fact by the defendants included, but were not limited to, the material misrepresentations of fact made in defendants' reports, invoices, and collection documentation.

690.     The defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

691.     The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate by submitting claims from Marc J. Rosenblatt, D.O.'s Flushing Clinic practice—from which they siphoned professional physician fees—for payment of No-Fault insurance benefits.

692. The defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

693. Allstate reasonably relied, to its detriment, upon the defendants' material misrepresentations concerning Marc J. Rosenblatt, D.O.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

694. Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to Marc J. Rosenblatt, D.O. regarding his Flushing Clinic practice—in excess of $369,078.03—for medical expenses and services rendered to Allstate claimants, even though Marc J. Rosenblatt, D.O. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XIII
## COMMON LAW FRAUD
### (Against Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun)

695. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

696. Defendants Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun (collectively, "Count XIII Defendants") conspired to defraud Allstate through their unlawful management and control of Dr. Yom's Chiropractic & Alternative Care.

697. The defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Yom (doing business as Dr. Yom's Chiropractic & Alternative Care) was entitled to receive No-Fault reimbursement under New York law.

698. The misrepresentations of fact by the defendants included, but were not limited to, the material misrepresentations of fact made in defendants' reports, invoices, and collection documentation.

699. The defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

700. The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate by submitting claims from Yom/Yom's Chiro—a chiropractic business that billed for treatment provided pursuant to a predetermined treatment protocol and patient referral arrangement—for payment of No-Fault insurance benefits.

701. The defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

702. Allstate reasonably relied, to its detriment, upon the defendants' material misrepresentations concerning Yom/Yom's Chiro's eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

703. Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to Yom/Yom's Chiro —in excess of $1,281,963.46—for healthcare expenses and services rendered to Allstate claimants, even though Yom/Yom's Chiro was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

**COMMON LAW FRAUD**
**(Against Dohyung Kim Physical Therapy, P.C., Dohyung Kim, P.T., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

704. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

705. Defendants Dohyung Kim Physical Therapy, P.C., Dohyung Kim, P.T., Jong Won Yom, D.C., L.Ac., Seungho Kim, Jeewha Kim, Michelle Chun, and 153 Plaza LLC (collectively, "Count XIV Defendants") conspired to defraud Allstate through their unlawful management and control of Dohyung Kim Physical Therapy, P.C.

706. The defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Dohyung Kim Physical Therapy, P.C. was entitled to receive No-Fault reimbursement under New York law.

707. The misrepresentations of fact by the defendants included, but were not limited to, the material misrepresentations of fact made in defendants' reports, invoices, and collection documentation.

708. The defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

709. The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate by submitting claims from Dohyung Kim Physical Therapy, P.C.—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

710. The defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

711.    Allstate reasonably relied, to its detriment, upon the defendants' material misrepresentations concerning Dohyung Kim Physical Therapy, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

712.    Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to Dohyung Kim Physical Therapy, P.C.—in excess of $1,050,682.79—for healthcare expenses and services rendered to Allstate claimants, even though Dohyung Kim Physical Therapy, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XV
## COMMON LAW FRAUD
**(Against Synergycare Physical Therapy, P.C., Dohyung Kim, P.T., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

713.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

714.    Defendants Synergycare Physical Therapy, P.C., Dohyung Kim, P.T., Jong Won Yom, D.C., L.Ac., Seungho Kim, Jeewha Kim, Michelle Chun, and 153 Plaza LLC (collectively, "Count XV Defendants") conspired to defraud Allstate through their unlawful management and control of Synergycare Physical Therapy, P.C.

715.    The defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Synergycare Physical Therapy, P.C. was entitled to receive No-Fault reimbursement under New York law.

716.     The misrepresentations of fact by the defendants included, but were not limited to, the material misrepresentations of fact made in defendants' reports, invoices, and collection documentation.

717.     The defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

718.     The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate by submitting claims from Synergycare Physical Therapy, P.C.—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

719.     The defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

720.     Allstate reasonably relied, to its detriment, upon the defendants' material misrepresentations concerning Synergycare Physical Therapy, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

721.     Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to Synergycare Physical Therapy, P.C.—in excess of $129,761.05—for healthcare expenses and services rendered to Allstate claimants, even though Synergycare Physical Therapy, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT XVI
## COMMON LAW FRAUD
**(Against JNR Acupuncture, P.C., Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun)**

722.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

723.     Defendants JNR Acupuncture, P.C., Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun (collectively, "Count XVI Defendants") conspired to defraud Allstate through their unlawful management and control of JNR Acupuncture, P.C.

724.     The defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that JNR Acupuncture, P.C. was entitled to receive No-Fault reimbursement under New York law.

725.     The misrepresentations of fact by the defendants included, but were not limited to, the material misrepresentations of fact made in defendants' reports, invoices, and collection documentation.

726.     The defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

727.     The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate by submitting claims from JNR Acupuncture, P.C.—an unlawfully operated and controlled professional service corporation—for payment of No-Fault insurance benefits.

728.     The defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that were not legitimate.

122

729.     Allstate reasonably relied, to its detriment, upon the defendants' material misrepresentations concerning JNR Acupuncture, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

730.     Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to JNR Acupuncture, P.C.—in excess of $223,790.41—for healthcare expenses and services rendered to Allstate claimants, even though JNR Acupuncture, P.C. was, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.


## COUNT XVII
### UNJUST ENRICHMENT
**(Against ORD Physiatry, P.C., Marc J. Rosenblatt, D.O., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

731.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

732.     As alleged herein, Defendants ORD Physiatry, P.C., Marc J. Rosenblatt, D.O., Jong Won Yom, D.C., L.Ac., Seungho Kim, Jeewha Kim, Michelle Chun, and 153 Plaza LLC (collectively, "Count XVII Defendants") conspired to induce Allstate to make numerous and substantial payments to ORD Physiatry, P.C. pursuant to New York's No-Fault Laws.

733.     As alleged herein, ORD Physiatry, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, (a) ORD Physiatry, P.C. was unlawfully operated and controlled by non-physicians Seungho Kim and Jeewha Kim, in part through 153 Plaza LLC; and (b) Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won

Yom, D.C., L.Ac., each a non-physician, unlawfully participated in the operation and management of ORD Physiatry, P.C.

734. When Allstate paid ORD Physiatry, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XVII Defendants, or those persons working under their control, made concerning ORD Physiatry, P.C.'s reimbursement eligibility under New York's No-Fault Laws.

735. Each and every No-Fault reimbursement payment that Allstate was caused to make to ORD Physiatry, P.C. during the course of this scheme constitutes a benefit that the Count XVII Defendants aggressively caused ORD Physiatry, P.C. to seek and voluntarily accept.

736. Throughout the course of their scheme, the Count XVII Defendants caused ORD Physiatry, P.C. to wrongfully obtain a multitude of payments from Allstate—in excess of $107,085.23—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

737. Under New York law, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.—as persons lacking legal authorization to (a) provide professional physician services, (b) control the provision of professional physician services, and (c) receive any fees or profits derived from the provision of professional physician services—never had any legal right to control ORD Physiatry, P.C., including its account receivables and/or the receipt and disbursement of any professional physician fees and profits obtained by ORD Physiatry, P.C., or to participate in the operation and management of ORD Physiatry, P.C.

738. As a direct and proximate result of Seungho Kim's, Jeewha Kim's, Michelle Chun's, and Jong Won Yom, D.C., L.Ac.'s unlawful control over ORD Physiatry, P.C. and/or

participation in the operation and management of ORD Physiatry, P.C., at no point was ORD Physiatry, P.C. ever eligible for reimbursement under New York's No-Fault Laws.

739.    Throughout the duration of this scheme, the Count XVII Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to ORD Physiatry, P.C.

740.    Retention of those benefits by the Count XVII Defendants would violate fundamental principles of justice, equity and good conscience.

## COUNT XVIII
## UNJUST ENRICHMENT
**(Against Marc J. Rosenblatt, D.O., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

741.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

742.    As alleged herein, Defendants Marc J. Rosenblatt, D.O., Jong Won Yom, D.C., L.Ac., Seungho Kim, Jeewha Kim, Michelle Chun, and 153 Plaza LLC (collectively, "Count XVIII Defendants") conspired to induce Allstate to make numerous and substantial payments to Marc J. Rosenblatt, D.O. pursuant to New York's No-Fault Laws.

743.    As alleged herein, Marc J. Rosenblatt, D.O. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, (a) Marc J. Rosenblatt, D.O.'s Flushing Clinic practice was unlawfully operated and controlled by non-physicians Seungho Kim and Jeewha Kim, in part through 153 Plaza LLC; (b) Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac., each a non-physician, unlawfully participated in the

operation and management of Marc J. Rosenblatt, D.O.'s Flushing Clinic practice; and (c) Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac., each a non-physician, unlawfully shared in the professional physician fees of Marc J. Rosenblatt, D.O.'s Flushing Clinic practice.

744.     When Allstate paid Marc J. Rosenblatt, D.O., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XVIII Defendants, or those persons working under their control, made concerning Marc J. Rosenblatt, D.O.'s reimbursement eligibility under New York's No-Fault Laws.

745.     Each and every No-Fault reimbursement payment that Allstate was caused to make to Marc J. Rosenblatt, D.O. regarding his Flushing Clinic practice during the course of this scheme constitutes a benefit that the Count XVIII Defendants aggressively caused Marc J. Rosenblatt, D.O. to seek and voluntarily accept.

746.     Throughout the course of their scheme, the Count XVIII Defendants caused Marc J. Rosenblatt, D.O. to wrongfully obtain a multitude of payments from Allstate—in excess of $369,078.03—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

747.     Under New York law, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.—as persons lacking legal authorization to (a) provide professional physician services, (b) control the provision of professional physician services, and (c) receive any fees or profits derived from the provision of professional physician services—never had any legal right to control Marc J. Rosenblatt, D.O.'s Flushing Clinic practice, including its account receivables and/or the receipt and disbursement of any professional physician fees and profits obtained by

Marc J. Rosenblatt, D.O., or to participate in the operation and management of Marc J. Rosenblatt, D.O.'s Flushing Clinic practice.

748.     As a direct and proximate result of Seungho Kim's, Jeewha Kim's, Michelle Chun's, and Jong Won Yom, D.C., L.Ac.'s unlawful control over Marc J. Rosenblatt, D.O.'s Flushing Clinic practice and/or sharing in the professional physician fees of Marc J. Rosenblatt, D.O.'s Flushing Clinic practice, at no point was Marc J. Rosenblatt, D.O. ever eligible for reimbursement for services performed at the Flushing Clinic practice under New York's No-Fault Laws.

749.     Throughout the duration of this scheme, the Count XVIII Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Marc J. Rosenblatt, D.O.

750.     Retention of those benefits by the Count XVIII Defendants would violate fundamental principles of justice, equity and good conscience.

**COUNT XIX**
**UNJUST ENRICHMENT**
**(Against Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun)**

751.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

752.     As alleged herein, Defendants Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun (collectively, "Count XIX Defendants")

conspired to induce Allstate to make numerous and substantial payments to Yom (doing business as Dr. Yom's Chiropractic & Alternative Care) pursuant to New York's No-Fault Laws.

753. As alleged herein, Dr. Yom's Chiropractic & Alternative Care was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Dr. Yom's Chiropractic & Alternative Care was caused to split its professional fees with 153 Plaza, Seungho Kim, Jeewah Kim, and Michelle Chun, and was used by the Count XIX Defendants as a means to submit charges to Allstate for chiropractic and acupuncture services that were excessive, medically unnecessary, and rendered pursuant to a predetermined treatment protocol and patient referral arrangement.

754. When Allstate paid Dr. Yom's Chiropractic & Alternative Care, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count XIX Defendants, or those persons working under their control, made concerning Dr. Yom's Chiropractic & Alternative Care's reimbursement eligibility under New York's No-Fault Laws.

755. Each and every No-Fault reimbursement payment that Allstate was caused to make to Dr. Yom's Chiropractic & Alternative Care during the course of this scheme constitutes a benefit that the Count XIX Defendants aggressively caused Dr. Yom's Chiropractic & Alternative Care to seek and voluntarily accept.

756. Throughout the course of their scheme, the Count XIX Defendants caused Dr. Yom's Chiropractic & Alternative Care to wrongfully obtain a multitude of payments from Allstate—in excess of $1,281,963.46—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

757.     As a direct and proximate result of Jong Won Yom, D.C., L.Ac.'s, Seungho Kim's, Jeewha Kim's, and Michelle Chun's unlawful conduct, at no point was Dr. Yom's Chiropractic & Alternative Care ever eligible for reimbursement under New York's No-Fault Laws.

758.     Throughout the duration of this scheme, the Count XIX Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Dr. Yom's Chiropractic & Alternative Care.

759.     Retention of those benefits by the Count XIX Defendants would violate fundamental principles of justice, equity and good conscience.

## COUNT XX
## UNJUST ENRICHMENT
**(Against Dohyung Kim Physical Therapy, P.C., Dohyung Kim, P.T., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

760.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

761.     As alleged herein, Defendants Dohyung Kim Physical Therapy, P.C., Dohyung Kim, P.T., Jong Won Yom, D.C., L.Ac., Seungho Kim, Jeewha Kim, Michelle Chun, and 153 Plaza LLC (collectively, "Count XX Defendants") conspired to induce Allstate to make numerous and substantial payments to Dohyung Kim Physical Therapy, P.C. pursuant to New York's No-Fault Laws.

762.     As alleged herein, Dohyung Kim Physical Therapy, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Dohyung Kim

Physical Therapy, P.C. was caused to split its professional fees with Seungho Kim, Jeewha Kim, and Michelle Chun, and was used by the Count XX Defendants as a means to submit charges to Allstate for physical therapy services that were excessive, medically unnecessary, and rendered pursuant to a predetermined treatment protocol and patient referral arrangement.

763. When Allstate paid Dohyung Kim Physical Therapy, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions made by the Count XX Defendants, or those persons working under their control.

764. Each and every No-Fault reimbursement payment that Allstate was caused to make to Dohyung Kim Physical Therapy, P.C. during the course of this scheme constitutes a benefit that the Count XX Defendants aggressively caused Dohyung Kim Physical Therapy, P.C. to seek and voluntarily accept.

765. Throughout the course of their scheme, the Count XX Defendants caused Dohyung Kim Physical Therapy, P.C. to wrongfully obtain a multitude of payments from Allstate—in excess of $1,050,682.79—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

766. As a direct and proximate result of Dohyung Kim, P.T.'s, Seungho Kim's, Jeewha Kim's, Michelle Chun's, and Jong Won Yom, D.C., L.Ac.'s unlawful conduct, at no point was Dohyung Kim Physical Therapy, P.C. ever eligible for reimbursement under New York's No-Fault Laws.

767. Throughout the duration of this scheme, the Count XX Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Dohyung Kim Physical Therapy, P.C.

130

768.     Retention of those benefits by the Count XX Defendants would violate fundamental principles of justice, equity and good conscience.

## COUNT XXI
## UNJUST ENRICHMENT
**(Against Synergycare Physical Therapy, P.C., Dohyung Kim, P.T., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

769.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

770.     As alleged herein, Defendants Synergycare Physical Therapy, P.C., Dohyung Kim, P.T., Jong Won Yom, D.C., L.Ac., Seungho Kim, Jeewha Kim, Michelle Chun, and 153 Plaza LLC (collectively, "Count XXI Defendants") conspired to induce Allstate to make numerous and substantial payments to Synergycare Physical Therapy, P.C. pursuant to New York's No-Fault Laws.

771.     As alleged herein, Synergycare Physical Therapy, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, Synergycare Physical Therapy, P.C. was caused to split its professional fees with 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun, and was used by the Count XXI Defendants as a means to submit charges to Allstate for physical therapy services that were excessive, medically unnecessary, and rendered pursuant to a predetermined treatment protocol and patient referral arrangement.

772.     When Allstate paid Synergycare Physical Therapy, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions made by the Count XXI Defendants, or those persons working under their control.

773.     Each and every No-Fault reimbursement payment that Allstate was caused to make to Synergycare Physical Therapy, P.C. during the course of this scheme constitutes a

132

benefit that the Count XXI Defendants aggressively caused Synergycare Physical Therapy, P.C. to seek and voluntarily accept.

774.     Throughout the course of their scheme, the Count XXI Defendants caused Synergycare Physical Therapy, P.C. to wrongfully obtain a multitude of payments from Allstate—in excess of $129,761.05—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

775.     As a direct and proximate result of Dohyung Kim, P.T.'s, Seungho Kim's, Jeewha Kim's, Michelle Chun's, and Jong Won Yom, D.C., L.Ac.'s unlawful conduct, at no point was Synergycare Physical Therapy, P.C. ever eligible for reimbursement under New York's No-Fault Laws.

776.     Throughout the duration of this scheme, the Count XXI Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to Synergycare Physical Therapy, P.C.

777.     Retention of those benefits by the Count XXI Defendants would violate fundamental principles of justice, equity and good conscience.

**COUNT XXII**
**UNJUST ENRICHMENT**
**(Against JNR Acupuncture, P.C., Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun)**

778.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

779.     As alleged herein, Defendants JNR Acupuncture, P.C., Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun (collectively, "Count XXII Defendants") conspired to induce Allstate to make numerous and substantial payments to JNR Acupuncture, P.C. pursuant to New York's No-Fault Laws.

780.     As alleged herein, JNR Acupuncture, P.C. was never eligible for reimbursement under New York's No-Fault Laws because, at all relevant times, JNR Acupuncture, P.C. was caused to split its professional fees with 153 Plaza LLC, Seungho Kim, Jeewah Kim, and Michelle Chun, and was used by the Count XXII Defendants as a means to submit charges to Allstate for acupuncture services that were excessive, medically unnecessary, and rendered pursuant to a predetermined treatment protocol and patient referral arrangement.

781.     When Allstate paid JNR Acupuncture, P.C., Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions made by the Count XXII Defendants, or those persons working under their control.

782.     Each and every No-Fault reimbursement payment that Allstate was caused to make to JNR Acupuncture, P.C. during the course of this scheme constitutes a benefit that the Count XXII Defendants aggressively caused JNR Acupuncture, P.C. to seek and voluntarily accept.

783.     Throughout the course of their scheme, the Count XXII Defendants caused JNR Acupuncture, P.C. to wrongfully obtain a multitude of payments from Allstate—in excess of $223,790.41—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

784. As a direct and proximate result of Jong Won Yom, D.C., L.Ac.'s, Seungho Kim's, Jeewha Kim's, and Michelle Chun's unlawful conduct, at no point was JNR Acupuncture, P.C. ever eligible for reimbursement under New York's No-Fault Laws.

785. Throughout the duration of this scheme, the Count XXII Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to JNR Acupuncture, P.C.

786. Retention of those benefits by the Count XXII Defendants would violate fundamental principles of justice, equity and good conscience.

## COUNT XXIII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against ORD Physiatry, P.C.)

787. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

788. To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

789. In view of its (a) illegal corporate structure, (b) unlawful control by one or more non-physician (i.e., Seungho Kim and Jeewha Kim), (c) unlawful sharing of professional physician fees with one or more non-physician (i.e., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun), (d) billing for healthcare services that were not rendered as represented, and (e) billing for excessive and medically unnecessary healthcare services, ORD Physiatry, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not

135

limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

790.     ORD Physiatry, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

791.     ORD Physiatry, P.C. continues to challenge Allstate's prior claim denials.

792.     ORD Physiatry, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

793.     A justifiable controversy exists between Allstate and ORD Physiatry, P.C. because ORD Physiatry, P.C. rejects Allstate's ability to deny such claims.

794.     Allstate has no adequate remedy at law.

795.     ORD Physiatry, P.C. will also continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by ORD Physiatry, P.C.

796.     Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that ORD Physiatry, P.C., at all relevant times, was (a) fraudulently incorporated, (b) unlawfully owned, operated, managed, and/or controlled by one or more non-physician, (c) engaged in the unlawful sharing of fees derived from the provision of professional physician services, (d) engaged in the billing for healthcare services not rendered as represented, and (e) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

**COUNT XXIV**

136

## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Marc J. Rosenblatt, D.O.)

797.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

798.     To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

799.     In view of the (a) unlawful control by one or more non-physician (i.e., 153 Plaza LLC, Seungho Kim and Jeewha Kim), (b) unlawful sharing of professional physician fees with one or more non-physician (i.e., Seungho Kim, Jeewha Kim, and Michelle Chun), (c) billing for healthcare services that were not rendered as represented, and (d) billing for excessive and medically unnecessary healthcare services, Marc J. Rosenblatt, D.O., practicing under his own name through the Flushing Clinic, has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law and New York Education Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

800.     Marc J. Rosenblatt, D.O. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

801.     Marc J. Rosenblatt, D.O. continues to challenge Allstate's prior claim denials.

802.     Marc J. Rosenblatt, D.O. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

137

803. A justifiable controversy exists between Allstate and Marc J. Rosenblatt, D.O. because Marc J. Rosenblatt, D.O. rejects Allstate's ability to deny such claims.

804. Allstate has no adequate remedy at law.

805. Marc J. Rosenblatt, D.O. will also continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that his activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Marc J. Rosenblatt, D.O. regarding his Flushing Clinic practice.

806. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Marc J. Rosenblatt, D.O.'s Flushing Clinic practice, at all relevant times, was (a) unlawfully owned, operated, managed, and/or controlled by one or more non-physician, (b) engaged in the unlawful sharing of fees derived from the provision of professional physician services, (c) engaged in the billing for healthcare services not rendered as represented, and (d) engaged in the billing for medically unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

## COUNT XXV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Jong Won Yom, D.C., L.AC. (d/b/a Dr. Yom's Chiropractic & Alternative Care))

807. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

808. To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

809.     In view of its (a) payment of financial compensation (i.e., patient referral payments) in exchange for patient referrals, and (b) billing for medically unnecessary healthcare services, Yom (doing business as Dr. Yom's Chiropractic & Alternative Care) has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law and New York Education Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

810.     Yom/Yom's Chiro continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

811.     Yom/Yom's Chiro continues to challenge Allstate's prior claim denials.

812.     Yom/Yom's Chiro continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

813.     A justifiable controversy exists between Allstate and Yom/Yom's Chiro because Yom/Yom's Chiro rejects Allstate's ability to deny such claims.

814.     Allstate has no adequate remedy at law.

815.     Yom/Yom's Chiro will also continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Yom/Yom's Chiro.

816.     Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Yom/Yom's Chiro at all relevant times, was (a) engaged in an improper patient referral arrangement, and (b) engaged in the billing for medically

139

unnecessary treatments and tests, and thus Yom/Yom's Chiro has no standing to submit or receive assigned No-Fault benefits.

**COUNT XXVI**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Dohyung Kim Physical Therapy, P.C.)**

817.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

818.    To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

819.    In view of its (a) payment of financial compensation (i.e., patient referral payments) in exchange for patient referrals from a purportedly physician-owned professional service corporation for unnecessary treatment, and (b) billing for medically unnecessary healthcare services, Dohyung Kim Physical Therapy, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

820.    Dohyung Kim Physical Therapy, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

821.    Dohyung Kim Physical Therapy, P.C. continues to challenge Allstate's prior claim denials.

822.    Dohyung Kim Physical Therapy, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

823.     A justifiable controversy exists between Allstate and Dohyung Kim Physical Therapy, P.C. because Dohyung Kim Physical Therapy, P.C. rejects Allstate's ability to deny such claims.

824.     Allstate has no adequate remedy at law.

825.     Dohyung Kim Physical Therapy, P.C. will also continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Dohyung Kim Physical Therapy, P.C.

826.     Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Dohyung Kim Physical Therapy, P.C. at all relevant times, was (a) engaged in an improper patient referral arrangement, and (b) engaged in the billing for medically unnecessary treatments and tests, and thus Dohyung Kim Physical Therapy, P.C. has no standing to submit or receive assigned No-Fault benefits.


**COUNT XXVII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Synergycare Physical Therapy, P.C.)**


827.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

828.     To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

829. In view of its (a) payment of financial compensation (i.e., patient referral payments) in exchange for patient referrals from a purportedly physician-owned professional service corporation for unnecessary treatment, and (b) billing for medically unnecessary healthcare services, Synergycare Physical Therapy, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

830. Synergycare Physical Therapy, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

831. Synergycare Physical Therapy, P.C. continues to challenge Allstate's prior claim denials.

832. Synergycare Physical Therapy, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

833. A justifiable controversy exists between Allstate and Synergycare Physical Therapy, P.C. because Synergycare Physical Therapy, P.C. rejects Allstate's ability to deny such claims.

834. Allstate has no adequate remedy at law.

835. Synergycare Physical Therapy, P.C. will also continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by Synergycare Physical Therapy, P.C.

143

836.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Synergycare Physical Therapy, P.C. at all relevant times, was (a) engaged in an improper patient referral arrangement, and (b) engaged in the billing for medically unnecessary treatments and tests, and thus Synergycare Physical Therapy, P.C. has no standing to submit or receive assigned No-Fault benefits.

**COUNT XXVIII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against JNR Acupuncture, P.C.)**

837.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth above in ¶¶ 1-539 as if fully set forth herein.

838.    To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

839.    In view of its (a) payment of financial compensation (i.e., patient referral payments) in exchange for patient referrals, and (b) billing for medically unnecessary healthcare services, JNR Acupuncture, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional healthcare services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

840.    JNR Acupuncture, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

841.    JNR Acupuncture, P.C. continues to challenge Allstate's prior claim denials.

842. JNR Acupuncture, P.C. continues to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

843. A justifiable controversy exists between Allstate and JNR Acupuncture, P.C. because JNR Acupuncture, P.C. rejects Allstate's ability to deny such claims.

844. Allstate has no adequate remedy at law.

845. JNR Acupuncture, P.C. will also continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or any future No-Fault claims submitted by JNR Acupuncture, P.C.

846. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that JNR Acupuncture, P.C. at all relevant times, was (a) engaged in an improper patient referral arrangement, and (b) engaged in the billing for medically unnecessary treatments and tests, and thus JNR Acupuncture, P.C. has no standing to submit or receive assigned No-Fault benefits.

## XI.    DEMAND FOR RELIEF

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Indemnity Company (collectively, "Allstate"), respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**ORD PHYSIATRY, P.C. ENTERPRISE**
**(Against Marc J. Rosenblatt, D.O., 153 Plaza LLC, Dohyung Kim, P.T., Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

145

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### ORD PHYSIATRY, P.C. ENTERPRISE
**(Against Marc J. Rosenblatt, D.O., 153 Plaza LLC, Dohyung Kim, P.T., Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### DOHYUNG KIM PHYSICAL THERAPY, P.C. ENTERPRISE
**(Against Dohyung Kim, P.T., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

### COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### DOHYUNG KIM PHYSICAL THERAPY, P.C. ENTERPRISE
**(Against Dohyung Kim, P.T., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

### COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### SYNERGYCARE PHYSICAL THERAPY, P.C. ENTERPRISE
**(Against Dohyung Kim, P.T., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

### COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### SYNERGYCARE PHYSICAL THERAPY, P.C. ENTERPRISE
**(Against Dohyung Kim, P.T., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### JNR ACUPUNCTURE, P.C. ENTERPRISE
### (Against Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### JNR ACUPUNCTURE, P.C. ENTERPRISE
### (Against Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun)

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

148

## COUNT IX
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## 153 PLAZA LLC ENTERPRISE
**(Against Seungho Kim, Jeewha Kim, Michelle Chun, Marc J. Rosenblatt, D.O., Jong Won Yom, D.C., L.Ac., Dohyung Kim, P.T., ORD Physiatry, P.C., Dr. Yom's Chiropractic and Alternative Care, Dohyung Kim Physical Therapy, P.C., Synergycare Physical Therapy, P.C., and JNR Acupuncture, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT X
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## 153 PLAZA LLC ENTERPRISE
**(Against Seungho Kim, Jeewha Kim, Michelle Chun, Marc J. Rosenblatt, D.O., Jong Won Yom, D.C., L.Ac., Dohyung Kim, P.T., ORD Physiatry, P.C., Dr. Yom's Chiropractic and Alternative Care, Dohyung Kim Physical Therapy, P.C., Synergycare Physical Therapy, P.C., and JNR Acupuncture, P.C.)**

(a) AWARD Allstate's actual and consequential damages to be established at trial;

(b) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interest, costs, and attorneys' fees;

(c) GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT XI
## COMMON LAW FRAUD
**(Against ORD Physiatry, P.C., Marc J. Rosenblatt, D.O., 153 Plaza LLC, Dohyung Kim, P.T., Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

## COUNT XII
## COMMON LAW FRAUD
**(Against Marc J. Rosenblatt, D.O., 153 Plaza LLC, Dohyung Kim, P.T., Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

## COUNT XIII
## COMMON LAW FRAUD
**(Against Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun)**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

**COUNT XIV**
**COMMON LAW FRAUD**
**(Against Dohyung Kim Physical Therapy, P.C., Dohyung Kim, P.T., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

**COUNT XV**
**COMMON LAW FRAUD**
**(Against Synergycare Physical Therapy, P.C., Dohyung Kim, P.T., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

## COUNT XVI
## COMMON LAW FRAUD
**(Against JNR Acupuncture, P.C., Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun)**

(a) AWARD Allstate its actual damages in an amount to be determined at trial;

(b) AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c) AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d) GRANT any other relief this Court deems just.

## COUNT XVII
## UNJUST ENRICHMENT
**(Against ORD Physiatry, P.C., Marc J. Rosenblatt, D.O., 153 Plaza LLC, Dohyung Kim, P.T., Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

(a) AWARD Allstate's actual consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

## COUNT XVIII
## UNJUST ENRICHMENT
**(Against Marc J. Rosenblatt, D.O., 153 Plaza LLC, Dohyung Kim, P.T., Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

(a) AWARD Allstate's actual consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

## COUNT XIX
## UNJUST ENRICHMENT
**(Against Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun)**

(a) AWARD Allstate's actual consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

## COUNT XX
## UNJUST ENRICHMENT
**(Against Dohyung Kim Physical Therapy, P.C., Dohyung Kim, P.T., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

(a) AWARD Allstate's actual consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

## COUNT XXI
## UNJUST ENRICHMENT
**(Against Synergycare Physical Therapy, P.C., Dohyung Kim, P.T., 153 Plaza LLC, Seungho Kim, Jeewha Kim, Michelle Chun, and Jong Won Yom, D.C., L.Ac.)**

(a) AWARD Allstate's actual consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

## COUNT XXII
## UNJUST ENRICHMENT
**(Against JNR Acupuncture, P.C., Jong Won Yom, D.C., L.Ac., 153 Plaza LLC, Seungho Kim, Jeewha Kim, and Michelle Chun)**

(a) AWARD Allstate's actual consequential damages to be determined at trial; and

(b) GRANT any other relief this Court deems just.

## COUNT XXIII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
**(Against ORD Physiatry, P.C.)**

(a) DECLARE that ORD Physiatry, P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York State and/or local licensing requirement necessary to provide professional physician services in New York;

(b) DECLARE that ORD Physiatry, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by ORD Physiatry, P.C.; and

153

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT XXIV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Marc J. Rosenblatt, D.O.)

(a) DECLARE that Marc. J. Rosenblatt, D.O.'s Flushing Clinic practice, at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York State and/or local licensing requirement necessary to provide professional physician services in New York;

(b) DECLARE that Marc. J. Rosenblatt, D.O.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Marc. J. Rosenblatt, D.O. regarding his Flushing Clinic practice; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT XXV
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Jong Won Yom, D.C., L.Ac. d/b/a Dr. Yom's Chiropractic & Alternative Care)

(a) DECLARE that Jong Won Yom, D.C., L.Ac. (doing business as Dr. Yom's Chiropractic & Alternative Care), at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Yom/Yom's Chiro's activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Yom/Yom's Chiro; and

(d) GRANT all other relief this Court deems just and appropriate.

154

## COUNT XXVI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Dohyung Kim Physical Therapy, P.C.)

(a) DECLARE that Dohyung Kim Physical Therapy, P.C., at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Dohyung Kim Physical Therapy, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Dohyung Kim Physical Therapy, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

## COUNT XXVII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Synergycare Physical Therapy, P.C.)

(a) DECLARE that Synergycare Physical Therapy, P.C., at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that Synergycare Physical Therapy, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Synergycare Physical Therapy, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

**COUNT XXVIII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against JNR Acupuncture, P.C.)**

(a) DECLARE that JNR Acupuncture, P.C., at all relevant times, has submitted bills to Allstate for medically unnecessary healthcare services in violation of at least one New York State and/or local licensing requirement necessary to provide professional healthcare services in New York;

(b) DECLARE that JNR Acupuncture, P.C.'s activities are unlawful;

(c) DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by JNR Acupuncture, P.C.; and

(d) GRANT all other relief this Court deems just and appropriate.

**JURY TRIAL DEMAND**

The plaintiffs demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

SMITH & BRINK, P.C.

*/s/ Richard D. King, Jr.*
_____

Richard D. King, Jr. (RK8381)
rking@smithbrink.com
Nathan A. Tilden (NT0571)
ntilden@smithbrink.com
Michael W. Whitcher (MW 7455)
mwhitcher@smithbrink.com
Shauna L. Sullivan (SS5624)
ssullivan@smithbrink.com
Jasmine G. Vieux (JG1805)
jvieux@smithbrink.com
1325 Franklin Ave, Suite 320
Garden City, NY 11530
Ph:  (347) 710-0050

Attorneys for the Plaintiffs,
*Allstate Insurance Company, Allstate Property &
Casualty Insurance Company,
Allstate Fire & Casualty Insurance Company, and
Allstate Indemnity Company*

Dated:  October 12, 2017